# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------- x
                                                              :
T.C. by his next friend D.S., A.H. by her next                :
friend E.H, R.D. by her next friend M.D., J.D. by             :
his next friend D.D., H.L., A.B., J.S., and M.L., on          :
behalf of themselves and all others similarly                 :     Case No. 1:22-cv-05045
situated, DISABILITY RIGHTS NEW YORK,                         :
                                                              :     CLASS ACTION COMPLAINT
                                 Plaintiffs,                   :     AND JURY DEMAND
                                                              :
              - against -                                      :
                                                              :
NEW YORK STATE DEPARTMENT OF                                   :
HEALTH; MARY BASSETT, in her official                         :
capacity as Commissioner of the New York State               :
Department of Health; NEW YORK STATE                          :
OFFICE FOR PEOPLE WITH                                         :
DEVELOPMENTAL DISABILITIES; and KERRI                         :
NEIFELD, in her official capacity as                          :
Commissioner of the New York State Office for                :
People with Developmental Disabilities,                       :
                                                              :
                                 Defendants.                   :
------------------------------------------------------------- x
```

Plaintiffs T.C. by his next friend D.S., A.H., by her next friend E.H., R.D. by her next

friend M.D., J.D. by his next friend D.D., H.L., A.B., J.S., and M.L., on behalf of themselves and

all others similarly situated, and Disability Advocates, Inc. d/b/a Disability Rights New York,

allege for their class action complaint against Defendants New York State Department of Health

("DOH"), Mary Bassett ("Bassett") in her official capacity as Commissioner of DOH, New York

State Office for People with Developmental Disabilities ("OPWDD"), and Kerri Neifeld

("Neifeld"), in her official capacity as Commissioner of OPWDD, as follows:

## NATURE OF THE CASE

1.      Defendants have flagrantly violated, and continue to violate, Plaintiffs' federal statutory right to reside in less-restrictive community-based residential settings, rather than being wrongly and illegally institutionalized in hospitals, nursing homes, and intermediate care facilities ("ICFs").

2.      Plaintiffs are all Medicaid recipients with developmental disabilities who are currently confined to institutional settings despite being ready, willing, and able to leave those settings and reside in community-based settings that would allow them to live fuller and richer lives.

3.      In order to live in the community, Plaintiffs wish to receive Home and Community Based Waiver ("HCBS Waiver") services and certified residential opportunities.  HCBS Waiver services include case management services, habilitation services, pre-vocational services, and pathways to employment, none of which can be furnished to individuals who remain in institutional settings.

4.      Defendants are charged with administering the programs that provide Plaintiffs with HCBS Waiver services and certified residential opportunities.  However, despite determining that Plaintiffs are eligible to receive those community-based services and certified residential opportunities, Defendants have failed to provide such services and opportunities to Plaintiffs, which has resulted in their long-term wrongful confinement to institutional settings.

5.      Defendants have also failed to provide Plaintiffs with their statutorily guaranteed right to a fair hearing, triggered by their failure to provide Plaintiffs with a meaningful opportunity to choose appropriate certified residential opportunities and HCBS Waiver services as opposed to institutionalization.

6.      Defendants have failed to develop an adequate method to administer certified community-based residential opportunities and HCBS Waiver services.  Instead, Defendants have adopted a practice of requesting that certified residential opportunity providers *voluntarily* agree to provide placements to eligible individuals, rather than incentivizing or compelling providers to do so.  This practice has resulted in a crisis of needless and widespread long-term institutionalization.

7.      Plaintiffs bring this action on behalf of themselves and all individuals similarly situated to obtain declaratory and injunctive relief compelling Defendants to fulfill their statutory obligations and allow Plaintiffs and all members of the putative class to be placed in residential alternatives to their current institutional confinement and live their best lives in the community.

8.      Information obtained under the New York Freedom of Information Law ("FOIL") reveals that Plaintiffs are far from alone in their circumstances; to the contrary, thousands of similarly-eligible individuals with developmental disabilities have been denied certified residential opportunities and HCBS Waiver services, which has left them confined to institutional settings indefinitely without an opportunity to challenge their confinement.  These individuals have languished in institutional settings for unreasonably long periods of time, with some—such as Plaintiff H.L.—remaining institutionalized while waiting more than six years for a certified residential opportunity and HCBS Waiver services.

9.      As detailed herein, Defendants' failure to provide certified residential opportunities and HCBS Waiver services to Plaintiffs and all persons similarly situated violates the Medicaid Act, 42 U.S.C. § 1396 *et seq.*; Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

10.     Plaintiffs seek to ensure that people with developmental disabilities are not unnecessarily institutionalized, but instead can be transferred to certified residential opportunities where they can live fuller lives and receive the panoply of HCBS Waiver services to which they are entitled.

## PARTIES

### I.     PLAINTIFFS

11.     Plaintiff T.C. is a 21-year-old man who is hospitalized at North Central Bronx Hospital in Bronx, New York while awaiting access to community-based residential opportunities and HCBS Waiver services.  He is diagnosed with autism spectrum disorder and moderate intellectual disability and is a qualified individual with a disability.  T.C. is a Medicaid recipient approved by OPWDD to receive HCBS Waiver services.  He brings this action by his next friend D.S. who is his legal guardian.

12.     Plaintiff A.H. is a 23-year-old woman who is hospitalized at Montefiore Hospital in Bronx, New York while awaiting access to community-based residential opportunities and HCBS Waiver services.  She is diagnosed with autism spectrum disorder and moderate intellectual disability and is a qualified individual with a disability.  A.H. is a Medicaid recipient approved by OPWDD to receive HCBS Waiver services.  She brings this action by her next friend E.H. who is her grandmother.

13.     Plaintiff R.D. is a 29-year-old woman who is currently living at Northeast Rehabilitation Center in Lake Katrine, New York while awaiting access to community-based residential opportunities and HCBS Waiver services.  She is diagnosed with a traumatic brain injury, mild intellectual disability, mood disorder, and anxiety, and is a qualified individual with a disability.  R.D. is a Medicaid recipient approved by OPWDD to receive HCBS Waiver services.  She brings this action by her next friend M.D. who is her legal guardian.

4

14.     Plaintiff J.D. is a 38-year-old man who is currently living at Northeast Rehabilitation Center in Lake Katrine, New York while awaiting access to community-based residential opportunities and HCBS Waiver services.  He is diagnosed with traumatic brain injury and is a qualified individual with a disability.  J.D. is a Medicaid recipient approved by OPWDD to receive HCBS Waiver services.  He brings this action by his next friend D.D. who is his legal guardian.

15.     Plaintiff H.L. is a 57-year-old man who is currently living at Sunmount Developmental Center in Tupper Lake, New York ("Sunmount") while awaiting access to community-based residential opportunities and HCBS Waiver services.  He is diagnosed with bipolar disorder, autism spectrum disorder, mild intellectual disability, is deaf, and is a qualified individual with a disability.  H.L is a Medicaid recipient approved by OPWDD to receive HCBS Waiver services.

16.     Plaintiff A.B. is a 28-year-old man who is currently living at Sunmount while awaiting access to community-based residential opportunities and HCBS Waiver services.  He is diagnosed with mild intellectual disability, schizophrenia, autism spectrum disorder, and a provisional diagnosis of Post-Traumatic Stress Disorder, and is a qualified individual with a disability.  A.B. is a Medicaid recipient approved by OPWDD to receive HCBS Waiver services.

17.     Plaintiff J.S. is a 25-year-old man who is currently living at Sunmount while awaiting access to community-based residential opportunities and HCBS Waiver services.  He is diagnosed with autism spectrum disorder and diabetes and is a qualified individual with a disability.  J.S. is a Medicaid recipient approved by OPWDD to receive HCBS Waiver services.

18.     Plaintiff M.L. is a 32-year-old woman who is currently living at Sunmount while awaiting access to community-based residential opportunities and HCBS Waiver services.  She is

diagnosed with mild intellectual disability, childhood traumatic brain injury, bipolar disorder, post-traumatic stress disorder and borderline personality disorder. M.L is a Medicaid recipient approved by OPWDD to receive HCBS Waiver services.

19. Plaintiff Disability Advocates, Inc., is an independent corporation organized under the laws of the State of New York, and maintains an office at 25 Chapel Street, Brooklyn, New York 11201. Disability Advocates, Inc. is authorized to conduct business under the name Disability Rights New York ("DRNY").

20. DRNY is a Protection and Advocacy system, as that term is defined under the Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. § 15041 *et seq.*, the Protection and Advocacy for Individuals with Mental Illness Act of 1986, 42 U.S.C. § 10801 *et seq.*, and the Protection and Advocacy of Individual Rights Act, 29 U.S.C. § 794e *et seq.* As New York State's Protection & Advocacy system, DRNY is specifically authorized to pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of individuals with disabilities.

21. Pursuant to the authority vested in it by Congress to file claims of abuse, neglect, and rights violations on behalf of individuals with disabilities, DRNY brings claims on behalf of individuals with disabilities, including the individuals named herein, whose rights have been violated pursuant to the Medicaid Act, 42 U.S.C. § 1396 *et seq.*; Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

## II.    DEFENDANTS

22. Defendant DOH is an agency of the State of New York, which maintains an office at 90 Church Street - 14th Floor New York, NY 10007-2919. DOH is a public entity as defined by 42 U.S.C § 12131(1)(A) and is a recipient of federal funds.

23.     Defendant Mary T. Bassett is the Commissioner of DOH, with all powers and duties set forth in and otherwise prescribed by law, statutes, rules and regulations.  Commissioner Bassett is responsible for the operation and administration of DOH, including oversight over the HCBS Waiver services administered by OPWDD, and is sued in her official capacity as Commissioner of DOH.

24.     Defendant OPWDD is an agency of the State of New York, which maintains an office at 2400 Halsey Street, Bronx, New York 10461.  OPWDD is a public entity as defined by 42 U.S.C. § 1231(1)(B) and is a recipient of federal funds.

25.     Defendant Kerri Neifeld is the Commissioner of OPWDD, with all powers and duties set forth in Mental Hygiene Law § 13.09 and otherwise prescribed by law, statutes, rules and regulations.  Commissioner Neifeld is responsible for the operation and administration of OPWDD, including its planning, programs and services for individuals with disabilities in New York, and is sued in her official capacity.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  This action is authorized by 42 U.S.C. § 1983 as an action seeking redress of the deprivation of statutory and Constitutional rights under color of law.  It is also authorized by the Medicaid Act, 42 U.S.C. § 1396 *et seq.*, the Americans with Disabilities Act, 42 U.S.C. § 12101, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794a(2), as an action seeking redress for discrimination on the basis of disability.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants perform their official duties by and through offices within this District and thus reside therein, and a substantial part of the events and omissions giving rise to the claims herein occurred in this District.  Two of the Plaintiffs are currently hospitalized in this District.

## LEGAL FRAMEWORK

### I.   MANDATES OF THE MEDICAID PROGRAM

28.     Medicaid is a joint federal-state program established under the Medicaid Act in order to ensure that rehabilitation, medical care, nursing, and other services are provided to low-income individuals who are unable to pay for such care.  42 U.S.C. § 1396 *et seq.*

29.     States may choose whether to participate in the Medicaid program.  However, once a State has chosen to participate in the Medicaid program, it must comply with all requirements set out in federal statutes and regulations to be eligible for federal funds.  42 U.S.C. §§ 1396a, 1396c.

30.     As detailed below and as relevant to the dispute here, these requirements include the obligation to (i) provide "medical assistance" with "reasonable promptness to all eligible individuals," (ii) provide an administrative fair hearing whenever a claim for medical assistance is denied or not acted upon with reasonable promptness, (iii) identify a single state agency to administer Medicaid programs, (iv) administer Medicaid programs pursuant to a federally-approved plan, and (v) where a State has elected to designate HCBS Waiver services as "medical assistance," comply with related federal regulatory requirements for that program.

31.     First, states must provide "medical assistance" with "reasonable promptness to all eligible individuals."  42 U.S.C. § 1396a(a)(8).

32.     This requirement obligates entities such as DOH and OPWDD to furnish services without any delay caused by the agency's administrative procedures.  42 C.F.R. § 435.930.

33.     Federal regulations require that the determination of eligibility for any applicant may not exceed ninety days for applicants who apply for Medicaid on the basis of disability.  42 CFR § 435.912(3).

34.     The Centers for Medicare and Medicaid Services ("CMS") has issued guidance on the reasonable promptness standard.  CMS' guidance states:

> the promptness with which a State must provide a needed and covered waiver service must be governed by a test of reasonableness.  The urgency of an individual's need, the health and welfare concerns of the individual, the nature of the services required, the potential need to increase the supply of providers, the availability of similar or alternative services, and similar variables merit consideration in such a test of reasonableness.  The complexity of 'reasonable promptness' issues may be particularly evident when a change of living arrangement is required.  Where the need for such a change is very urgent (*e.g.*, as in the case of abuse in a person's current living arrangement), then 'reasonable promptness' could mean 'immediate.'

Department of Health and Human Services *Olmstead* Update #4, *available at* https://downloads.cms.gov/cmsgov/archived-downloads/SMDL/downloads/smd011001a.pdf.

35.     Second, federal law mandates that Medicaid recipients have the right to an administrative fair hearing whenever their claim for medical assistance is denied or not acted upon with reasonable promptness.  42 U.S.C. § 1396a(a)(3).

36.     New York is required to provide the opportunity for a fair hearing to any individuals "who are not given the choice of home and community-based services as an alternative to the institutional care."  *See HCBS Waiver Application*, page 219, *available at* https://opwdd.ny.gov/system/files/documents/2021/06/cms-approved-7-1-21-amendment.pdf.

37.     Third, federal law requires participating states to administer their Medicaid programs through a "single state agency."  42 U.S.C. § 1396a(a)(5).

38.     While the single state agency may delegate certain functions, it is prohibited from delegating "the authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters."  42 C.F.R. § 431.10(c), (e).

39.     In New York State, DOH acts as the "single state agency" for administering Medicaid programs.  N.Y. Soc. Serv. L. § 363-a(1).

40.     Fourth, participating states must administer the Medicaid program according to a plan that has been federally approved.  42 C.F.R. §§ 430.12, 430.14.

41.     Fifth, where a State has elected to designate HCBS Waiver services as "medical assistance," it is obligated to comply with related federal requirements for that program.  New York has made such an election.  42 U.S.C. § 1396n *et seq*.

42.     One such requirement is that participating states must inform individuals who are eligible for the HCBS Waiver program of the "feasible alternatives" to institutional care and give such individuals the opportunity to choose such alternatives.  42 U.S.C. § 1396n(c)(2)(C), 42 C.F.R. § 441.302(d).

## II.     NEW YORK'S HCBS WAIVER PROGRAM

43.     The HCBS Waiver program was created through Congress' 1981 addition of Section 1915(c) to the Social Security Act, which permitted the Secretary of the Department of Health and Human Services to waive certain Medicaid requirements for States receiving federal funding in order to enable the development of specialized community-based programs and services for people with intellectual and developmental disabilities, among others.  42 U.S.C. § 1396n.

44.     The purpose of the HCBS Waiver program is to encourage States to provide community-based supports and services to ensure that people with disabilities are not unnecessarily institutionalized or segregated.  *See* 42 C.F.R. 440.180.

45.     Because the point of the HCBS Waiver is to prevent unnecessary institutionalization, to be eligible, a Medicaid recipient must be determined to require the level of care provided in a hospital, nursing home, or ICF.  42 U.S.C. § 1396n(c)(1).

46.     Likewise, HCBS Waiver services cannot be furnished to individuals who are inpatients of a hospital, nursing facility or an intermediate care facility for individuals with intellectual disabilities ("ICF/IID").  42 C.F.R. § 441.301(b)(1)(ii).

47.     To participate in the HCBS Waiver, states must provide necessary safeguards to protect the health and welfare of individuals provided services thereunder. 42 U.S.C. § 1396n(c)(2)(A).

48.     New York has adopted the HCBS Waiver program, which provides Plaintiffs numerous rights under federal law and places numerous obligations on DOH and OPWDD concerning Plaintiffs' requests to access that program.

49.     In its application for the HCBS Waiver program, New York State documented its assurance that it would provide to all individuals determined eligible for institutional care, "the choice of either institutional or home and community-based waiver services." *HCBS Waiver Application*, page 8.

50.     In New York State, HCBS Waiver services include, among other things, case management services, habilitation services, prevocational services, supported employment services, environmental modifications, adaptive technologies, respite services, pathways to employment, and community transition services. 14 N.Y.C.R.R. § 635-10.4.

51.     These services are necessary for individuals with developmental disabilities, such as Plaintiffs, to live successfully in community settings.

52.     In New York State, the intent of HCBS Waiver services is to create an individualized service environment meeting the person's needs, preferences, and personal goals. The individualized service environment, in turn, provides the supports or services necessary to enable a person with a developmental disability to live, work, socialize, and participate in the community. 14 N.Y.C.R.R. § 635-10.2(a).

53.     In order to establish eligibility for HCBS Waiver services in New York State, an individual must document that they are an individual who:  (a) has a diagnosis of developmental

disability; (b) is eligible for ICF/IID level of care (*i.e.,* placement in an ICF/IID); (c) is an enrolled Medicaid recipient or is eligible for enrollment; (d) exercised freedom of choice between receipt of waiver services or placement in an ICF/IID; and (e) will reside in an appropriate living arrangement (*i.e.,* his/her own home or that of relatives, a supervised or supportive community residence, a certified Individualized Residential Alternative ("IRA"), or in a certified family care home) at the time of enrollment.  A person may not reside in an ICF/IID, or if he or she has resided in an ICF/IID (including a developmental center), he or she must be fully discharged from that setting prior to receipt of HCBS Waiver services.  14 N.Y.C.R.R. § 635-10.3(b).

54.    Each individual who is approved for participation in the HCBS Waiver must be "assisted by a specific case manager" who is responsible for working with the individual to create and sustain an "individualized service environment."  14 N.Y.C.R.R. § 635-10.4(a)(1), (2).

55.    New York State does not limit or cap the number of individuals it is able to serve with HCBS Waiver services in any given year.  *HCBS Waiver Application*, p. 19.

56.    As the designated single state agency for the administration of Medicaid in New York, DOH remains responsible for the oversight of OPWDD's operation of the HCBS Waiver program.

57.    DOH and OPWDD have entered into a Memorandum of Understanding ("MOU") governing the administration and operation of the HCBS Waiver program.  The MOU establishes that "OPWDD maintains the successful day-to-day operation of the HCBS Waiver, while DOH, as the oversight agency, is responsible for evaluating OPWDD's performance in accomplishing its operational and administrative functions."  *HCBS Waiver Application,* p. 2.

58.     New York is also required to provide the opportunity for a fair hearing to any individuals "who are not given the choice of home and community-based services as an alternative to the institutional care." *HCBS Waiver Application*, page 219.

59.     DOH is responsible for the system of administrative fair hearings which exists in part to adjudicate any disputes related to eligibility for HBCS Waiver Services.

60.     DOH establishes the monetary rates payable from Medicaid funds for HCBS Waiver services.

61.     DOH establishes monetary caps on HCBS Waiver services based on an individual's functional ability and needs.

62.     Both OPWDD and DOH are responsible for the lawful administration of the HCBS Waiver program in New York as a condition of receipt of federal Medicaid funds.

## III.     THE AMERICANS WITH DISABILITIES ACT, THE REHABILITATION ACT, AND THE INTEGRATION MANDATE

63.     Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12131 *et seq.*, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

64.     Implementing regulations for Title II of the ADA require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).

65.     The ADA defines a "public entity" as "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(B).

66.     DOH and OPWDD are public entities subject to the requirements of Title II of the ADA and, therefore, HCBS Waiver services must be provided in the most integrated setting appropriate to an individual's needs.

67.     Additionally, "a public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; or (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3).

68.     Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, imposes identical requirements on programs and activities that receive federal financial assistance. *See*, *e.g*., 45 C.F.R. § 84.4(b)(2) ("most integrated setting" regulation).

69.     Medicaid is subject to the requirements of Section 504 of the Rehabilitation Act because it is a federally funded program.  42 U.S.C. § 1396-1.

70.     Because "unjustified institutional isolation of persons with disabilities is a form of discrimination," the Rehabilitation Act requires that individuals with disabilities receive public services in the most integrated settings appropriate.  28 C.F.R. §§ 41.51(d), 84.4(b)(2).

71.     In 1999, the Supreme Court of the United States decided *Olmstead v. L.C.*, 527 U.S. 581 (1999), which held that "unjustified institutional isolation of persons with disabilities is a form of discrimination."  *Id*. at 597, 600-02.

72.     The combined requirements of the ADA, Section 504 of the Rehabilitation Act, and *Olmstead* are often referred to as the "integration mandate."

73.     An "integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible."  28 C.F.R. part 35, App. B.

14

74.    The Department of Justice has further defined "segregated settings" under *Olmstead* as having the "qualities of an institutional nature" and include, but are not limited to: (1) congregate settings populated exclusively or primarily with individuals with disabilities; (2) congregate settings characterized by regimentation in daily activities, lack of privacy or autonomy, policies limiting visitors, or limits on individuals' ability to engage freely in community activities and to manage their own activities of daily living; or (3) settings that provide for daytime activities primarily with other individuals with disabilities.

75.    As a result of the Supreme Court's decision in *Olmstead*, New York State developed an "*Olmstead* Plan" which "identifies specific actions state agencies responsible for providing services to people with disabilities will take to serve people with disabilities in the most integrated setting."   Report and Recommendations of the *Olmstead* Cabinet, *available at* https://www.ny.gov/sites/default/files/atoms/files/Olmstead_Final_Report_2013.pdf.

76.    The United States Department of Justice has defined what an *Olmstead* Plan is in the following way:

> An *Olmstead* plan is a public entity's plan for implementing its obligation to provide individuals with disabilities opportunities to live, work, and be served in integrated settings.  A comprehensive, effectively working plan must do more than provide vague assurances of future integrated options or describe the entity's general history of increased funding for community services and decreased institutional populations.  Instead, it must reflect an analysis of the extent to which the public entity is providing services in the most integrated setting and must contain concrete and reliable commitments to expand integrated opportunities.  The plan must have specific and reasonable timeframes and measurable goals for which the public entity may be held accountable, and there must be funding to support the plan, which may come from reallocating existing service dollars.  The plan should include commitments for each group of persons who are unnecessarily segregated, such as individuals residing in facilities for individuals with developmental disabilities, psychiatric hospitals, nursing homes and board and care homes, or individuals spending their days in sheltered workshops or segregated day programs.  To be effective, the plan must have demonstrated success in actually moving individuals to integrated settings in accordance with the plan. A public entity cannot rely on its *Olmstead* plan as part of its defense unless it can prove that

15

> its plan comprehensively and effectively addresses the needless segregation of the group at issue in the case. Any plan should be evaluated in light of the length of time that has passed since the Supreme Court's decision in *Olmstead*, including a fact-specific inquiry into what the public entity could have accomplished in the past and what it could accomplish in the future.

*See* Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C., available at* https://www.ada.gov/olmstead/q&a_olmstead.htm.

## FACTS

**I.     THE HCBS WAIVER SERVICES CRISIS FOR PEOPLE WITH DEVELOPMENTAL DISABILITIES IN NEW YORK**

77.     DOH and OPWDD's mismanagement of the HCBS Waiver program has led to a crisis for people with developmental disabilities in New York who must rely on HCBS Waiver services to live in the community, including Plaintiffs.

**A.     *The Crisis For The Named Plaintiffs***

**1.     Plaintiff T.C.**

78.     T.C. is a 21-year-old man who is a resident of New York State.

79.     T.C. wants to live in a community-based home where he can receive the services he needs to maximize his independence.

80.     T.C. is autistic and has a moderate intellectual disability and is unable to care for himself without significant assistance.

81.     T.C. knows approximately 5-10 words, and otherwise uses basic signs and gestures, body language, and vocalizations to communicate his wants and needs.

82.     T.C. also has a sensory processing disorder and can exhibit impulsive and challenging behaviors when there are sudden changes in his routine or environment.

83.     Because he sometimes engages in unsafe behaviors, T.C. needs to be supervised 24 hours per day.

84.     Before December 10, 2021, T.C. lived with his mother, D.S., in their home in Bronx, New York.  D.S, his next friend, is his legal guardian.

85.     On December 10, 2021, T.C. exhibited a behavioral episode prompting D.S. to bring him to North Central Bronx Hospital.

86.     North Central Bronx Hospital is a medical institution as defined by 42 C.F.R. § 435.1010.

87.     T.C. has remained in the hospital since his admission on December 10, 2021.

88.     T.C.'s treatment team at the hospital determined that he was ready for discharge approximately three weeks after his admission, on or about January 1, 2022.  Even before he was ready for discharge, T.C. was recommended for a community residential opportunity by his treating clinicians at the hospital.

89.     Although it was informed of T.C.'s need for a certified residential opportunity on or about December 21, 2021, OPWDD has not successfully placed T.C. in a community-based residential opportunity.

90.     Once he is discharged from the hospital, T.C. will need assistance with medical appointments, meal preparation, shopping, cleaning, laundry, and taking his medications.

91.     OPWDD has attempted to identify a suitable certified residential opportunity for T.C. by having its Certified Residential Opportunity Team ("CRO Team") make referrals to various private agencies that might have potential residential vacancies in IRAs licensed by OPWDD.

92.     OPWDD did not make its first referral for potential placements for T.C. until on or about February 7, 2022.

93.     Since that time, OPWDD has referred T.C.'s case to at least ten voluntary agencies that have had vacancies in their IRAs.  All the agencies that have assessed T.C. have rejected him.

94.     OPWDD has provided no information to T.C. or his next friend concerning why it will not place T.C. in one of the IRAs it operates.

95.     Defendants have also failed to compel any agency to accept T.C.

96.     Although OPWDD has placed T.C. on its highest priority "emergency" list for placement, this has not resulted in T.C. being placed at an IRA.

97.     Since December 10, 2021, T.C. has spent most of his time confined to a hospital room at North Central Bronx Hospital.

98.     T.C. is suffering in the hospital.

99.     Because he is institutionalized, OPWDD is not providing T.C. with any of the HCBS Waiver services that he desperately needs; indeed, OPWDD is not providing T.C. with any day-to-day support at all while he waits for a certified residential opportunity.

100.    Before his admission, T.C. was energetic and active, directing himself quickly from one physical activity to the next within a short span of time and preferring physical actions (such as jumping on a trampoline in his backyard) to quieter activities, though he also enjoyed listening to music, using his tablet, and watching his favorite program, the Wendy Williams Show.

101.    This has all changed since he was admitted to North Central Bronx Hospital.

102.    T.C. is never able to go outside.  North Central Bronx Hospital has no outdoor recreation area for psychiatric patients.

18

103.    T.C. is not able to go into the neighborhood outside the hospital or a public playground or park.

104.    T.C. cannot get into anything resembling a routine.  Though the hospital offers treatment and activity groups to its patients, these are not geared towards clients with intellectual or developmental disabilities, and T.C. is unable to meaningfully participate.

105.    T.C. lives in a bare room with a chair, a desk, a dresser, and a bed that is anchored to the floor. There is no television or other form of entertainment in his room, so T.C. spends much of his time there without any activities to keep him occupied.  There is one television on the unit located in the community room, which is shared among twenty-three patients.

106.    Prior to his hospitalization, T.C. loved to eat and happily ate his favorite dishes like stewed oxtails, rice and peas, and fried chicken.  Since December 10, 2021, T.C. has been eating hospital food.  Although T.C. is able to eat independently, there is no refrigerator in his room, and he must rely on staff to bring him water and snacks.

107.    North Central Bronx Hospital's psychiatric unit has an average length of stay of roughly twelve days.  Although T.C. has an affectionate disposition, he has not been able to make friends on the unit because existing patients are routinely discharged and replaced with new patients who are entering onto the unit with acute psychosis, mania, or depression.

108.    Remaining in the psychiatric unit at North Central Bronx Hospital poses a serious risk of harm for T.C.

109.    T.C. is on constant 1:1 supervision on the unit, mostly to protect him from other patients.

110.    Even under 1:1 supervision on the unit, T.C. was punched in the face by another patient who was acutely ill.  T.C.'s doctors fear that this could happen again if he remains on the unit.

111.    T.C. initially spent much of his time pacing around the unit because of the lack of suitable activities for him.  Hospital staff now purposefully restrict his access to many areas on the unit to keep him safe from other patients, which often leaves him confined to his room.

112.    Without any semblance of normalcy, placement into a certified residential opportunity, and the HCBS Waiver services to which he is entitled, T.C. is in imminent danger of regression.

### 2.    Plaintiff A.H.

113.    A.H. is a 23-year-old woman who is a resident of New York State.

114.    A.H. wants to live in a community-based home where she can receive the services she needs to maximize her independence.

115.    A.H. is diagnosed with autism spectrum disorder and moderate intellectual disability and is unable to care for herself without significant assistance.

116.    A.H. knows only a few words but is otherwise non-verbal, communicating her needs using gestures and a communication board.

117.    Psychological reports note that A.H. has significant delays in most domains, especially in fine and gross motor skills. She can present with difficult behaviors if she does not have the proper care required to ensure a structured routine and environment.

118.    Because she sometimes engages in unsafe behaviors, A.H. needs to be supervised 24 hours per day.

119.    For most of her life, A.H. was cared for by her grandmother and next friend, E.H., in their home in Bronx, New York.

120.    A.H.'s grandmother spent her career working in various OPWDD-licensed programs and ensured that A.H. always received the specialized care needed for her disability.

121.    Since she was 18 months old, A.H. attended a specialized school where she received speech, physical, and occupational therapy.  As a teenager, A.H. received community habilitation and supplemental day habilitation services from OPWDD-licensed providers.

122.    Though A.H.'s mother was rarely involved in her early life, A.H.'s mother returned to the family home last year following her release from prison.  She physically abused A.H.'s grandmother and caregiver, E.H., causing E.H. to leave the home and be admitted to a nursing home specializing in elder abuse.

123.    After E.H.'s admission to the nursing home, A.H.'s mother disenrolled A.H. from all her OPWDD-provided programming.

124.    On January 21, 2022, A.H.'s mother brought her to Montefiore Medical Center for treatment.  Upon admission, it was discovered that A.H. had cocaine in her system.  A.H.'s mother told the hospital that she had also administered her own psychotropic medication to A.H.

125.    On February 2, 2022, A.H. was transferred from a medical unit to the psychiatric ward of Montefiore Medical Center Wakefield Campus for further treatment.

126.    Montefiore Medical Center Wakefield Campus is a medical institution as defined by 42 C.F.R. § 435.1010.

127.    A.H. has remained continuously hospitalized since her admission on February 2, 2022.

128.    A.H.'s treatment team determined that A.H. was stabilized and ready for discharge on or about March 1, 2022.

129.    Because A.H.'s mother cannot appropriately care for her and A.H.'s grandmother is in a nursing home, A.H.'s treatment team has determined that a community-based residential opportunity would be the appropriate discharge setting for A.H.

130.    Once she is discharged from the hospital, A.H. will need assistance with medical appointments, travel, dressing, bathing, house cleaning, and meal preparation.

131.    A.H. is eligible for a community-based residential placement and HCBS Waiver services.

132.    Due to Defendants' failure to provide A.H. with an appropriate residential discharge placement, A.H. currently remains hospitalized.

133.    Although A.H. was referred by her care manager to OPWDD for placement in a community-based residential setting on or about February 14, 2022, OPWDD has not yet identified any community-based residential opportunity willing to accept A.H.

134.    OPWDD has attempted to identify a suitable certified residential opportunity for A.H. by having its CRO Team make referrals to various private agencies that might have potential residential vacancies in IRAs licensed by OPWDD.

135.    OPWDD made its first referral to a private agency for potential placement of A.H. on March 16, 2022. Since that time, OPWDD has referred A.H.'s case to at least ten voluntary agencies that have had vacancies in their IRAs. All the agencies that have assessed A.H. have rejected her.

136.    OPWDD has not provided information to A.H. or her next friend concerning why it will not place A.H. in one of the IRAs it operates.

137.    Defendants have also failed to compel any agency to accept A.H.

138.    Although OPWDD has placed A.H. on its highest priority "emergency" list for placement, this has not resulted in A.H. being placed at an IRA.

139.    Since February 2, 2022, A.H. has spent all her time confined to a locked hospital ward at Montefiore Medical Center Wakefield Campus.

140.    A.H. is suffering in the hospital.

141.    Because she is institutionalized, OPWDD is not providing A.H. with any of the HCBS Waiver services that she desperately needs.  OPWDD is not providing A.H. with any day-to-day support at all while she waits for a certified residential opportunity.

142.    Before her admission, A.H. participated in a range of community activities which included going to school, spending time playing outside, going to programming on weekends, and watching her favorite videos on YouTube.

143.    Since she was admitted to Montefiore Medical Center Wakefield Campus, A.H. is never able to go outside.  Montefiore Medical Center Wakefield Campus has no outdoor recreation area for psychiatric patients.

144.    A.H. is never able to go into the local neighborhood or to a public playground or park.

145.    A.H. does not have computer access on the unit and is unable to access any of her favorite videos or other websites.

146.    Although the hospital offers treatment and activity groups to its patients, these are not geared towards individuals with intellectual or developmental disabilities and A.H. is unable to meaningfully participate.  For much of her hospitalization, she has been restricted from attending these groups due to behaviors (such as rolling on the floor or disrobing) that are disruptive to the other patients.

147.    A.H. lives in a room with only basic furniture and no form of entertainment.  A.H. has few activities to keep her occupied.  She spends much of her time asleep.

148.    Although A.H. has minimal communication skills to describe how she is feeling, her actions demonstrate frustration with her extended stay on the psychiatric unit.  Staff report that A.H. frequently paces back and forth in the hallways and that she sometimes bangs on the walls and windows to indicate her unhappiness.

149.    Over the course of A.H.'s time in the hospital, she has become more easily redirectable when her frustration leads to behavioral outbursts.  However, without placement into a certified residential opportunity and the HCBS Waiver services to which she is entitled, A.H. is in danger of regression and harm.

### 3.    Plaintiff R.D.

150.    R.D. is a 29-year-old woman who is a resident of New York State.

151.    R.D. wants to live in a community-based home where she can receive the services she needs to maximize her independence.

152.    R.D. currently resides at the Northeast Center for Rehabilitation and Brain Injury, a nursing facility in Lake Katrine, New York ("Northeast").

153.    Northeast is an institution as defined by 42 C.F.R. § 435.1010.

154.    R.D. is diagnosed with a traumatic brain injury ("TBI").  She is also diagnosed with a mild intellectual disability, mood disorder, and anxiety.

155.    R.D. is able to communicate verbally and express her wants, needs, and goals.

156.    Due to her disabilities, R.D. requires supervision and support in order to maintain her health and safety.  She requires assistance managing her emotions and behaviors, managing her finances, managing medical care, and performing activities of daily living such as cooking and cleaning.

157.    R.D. was admitted to Northeast in 2014.

158.    Aside from an approximately two-month period in 2016, R.D. has remained at Northeast since 2014.

159.    R.D. has been recommended for a community residential opportunity by her treating clinicians at Northeast since 2018.

160.    R.D. has limited family and they are not able to provide her with the support she needs to live in the community.

161.    OPWDD has determined that R.D. is eligible for community-based HCBS Waiver services and a residential opportunity.

162.    The community services R.D. requires include residential and day habilitation and case management.

163.    R.D. has been waiting to receive community-based HCBS Waiver services and a residential opportunity for nearly five years.

164.    OPWDD categorically places individuals residing in nursing facilities and ready to move to the community, like R.D., under its "substantial need" priority on its residential placement list.

165.    R.D.'s referral has been highlighted several times before OPWDD's Access to Residential Opportunities Committee at their monthly meetings, but this has still not resulted in her receiving a certified residential opportunity.

166.    To date, no voluntary provider has offered her a residential opportunity.

167.    Because OPWDD and DOH give voluntary providers the discretion to decide whether to accept an individual, neither OPWDD nor DOH has taken any steps to compel any provider to accept R.D.

168.     OPWDD has also determined not to place R.D. in any of the residential opportunities it operates.

169.     OPWDD has not provided any information concerning why it will not place R.D. in one of its own programs.

170.     Because Northeast is not a community setting, R.D. cannot obtain the HCBS Waiver services that she needs as long as she remains there.

171.     R.D.'s unnecessary institutionalization at Northeast results in considerable limitations to her freedom, including her ability to choose her daily activities, go outdoors, and participate in her local community.

172.     Due to the COVID-19 pandemic and its particularly devastating impact on nursing facilities, R.D. has been confined to her room for a significant portion of the last two years. This has left her isolated, bored, and frustrated.

173.     R.D. has a strong desire to increase her independence. Without the HCBS Waiver services to which she is entitled, she is unable to make progress toward achieving her goals.

174.     R.D.'s next friend, her uncle, M.D., was appointed the guardian of her person and property in 2015 pursuant to Surrogate's Court Procedure Act Article 17-a.

### 4.     Plaintiff J.D.

175.     J.D. is a 38-year-old man who is a resident of New York State.

176.     J.D. wants to live in a community-based home where he can receive the services he needs to maximize his independence.

177.     J.D. currently resides at Northeast.

178.     Northeast is an institution as defined by 42 C.F.R. § 435.1010.

179.     J.D. is diagnosed with TBI.

180.     J.D. is able to communicate verbally and express his wants, needs, and goals.

181.   Due to his disability, J.D. requires supervision and support.

182.   J.D. requires assistance handling his medical care, managing money, accommodating his memory loss, and accessing his community safely.

183.   J.D. requires a supervised living environment in order to maintain his health and safety.

184.   J.D. was admitted to Northeast in 2019, where he remains today.

185.   J.D. has been recommended for a community residential opportunity by his treating clinicians at Northeast since June 2021.

186.   J.D.'s family is not able to provide him with the support he needs to live in the community.

187.   OPWDD has determined that J.D. is eligible for community-based HCBS Waiver services and a certified residential opportunity.

188.   The community services J.D. requires include residential and community habilitation, employment supports, and case management.

189.   J.D. has been waiting to receive community-based HCBS Waiver services and a certified residential opportunity for nearly a year.

190.   OPWDD categorically places individuals residing in nursing facilities and ready to move to the community, like J.D., under its "substantial need" priority on its residential placement list.

191.   To date, no voluntary provider has offered him a residential opportunity.

192.   Because OPWDD and DOH give voluntary providers the discretion to decide whether to accept an individual, neither OPWDD nor DOH has taken any steps to compel any provider to accept J.D.

193.    OPWDD has also determined not to place J.D. in any of the residential opportunities it operates.

194.    OPWDD has not provided any information concerning why it will not place J.D. in one of its own programs.

195.    J.D.'s mother has called OPWDD to check on his status on the waitlist and was told that OPWDD will reach out when something is available, but she is still waiting for them to call. She reports that the staff member informed her that because J.D. is not homeless he is not first priority for placement.

196.    Because Northeast is not a community setting, J.D. cannot obtain the HCBS Waiver services that he needs as long as he remains there.

197.    J.D.'s unnecessary institutionalization at Northeast results in considerable limitations to his freedom, including his ability to choose his daily activities, go outdoors, and participate in his local community.

198.    Due to the COVID-19 pandemic and its particularly devastating impact on nursing facilities, J.D. has been confined to his room for a significant portion of the last two years.

199.    J.D. desires to live with peers in the community.

200.    Without the HCBS Waiver services to which he is entitled, he is unable to achieve this goal.

201.    J.D.'s mother and next friend, D.D., was appointed as his legal guardian in 2004.

### 5.    Plaintiff H.L.

202.    H.L. is a 57-year-old man who is a resident of New York State.

203.    H.L. wants to live in a community-based home where he can receive the services he needs to maximize his independence.

204.    H.L. has lived at Sunmount since April 16, 2003.

205.    H.L. is diagnosed with bipolar disorder, autism spectrum disorder, mild intellectual disability, personality disorder, and is deaf.

206.    H.L. communicates using sign language, minimal lip-reading and natural gestures. He benefits from sign language interpreting and from using an iPad to supplement communication during medical appointments and team meetings.

207.    Sunmount is classified as an institution, a school under New York Law (N.Y. Mental Hygiene Law ("MHL") § 1.03[11]), and an intermediate care facility within the meaning of federal regulations.  *See* 42 C.F.R. 435.1010.

208.    Sunmount is operated by OPWDD.

209.    Approximately 120 individuals with developmental disabilities live on the campus of Sunmount in one of three residential units including the Local Intensive Treatment Unit ("LIT").

210.    The LIT is a former Department of Veterans Affairs Hospital ward.  Meals are cooked in a central kitchen and served on cafeteria trays.

211.    The residential units at the LIT look like hospital wards, not homes.

212.    The doors into and out of the residential units are monitored by staff around the clock.

213.    There is no direct access from the residential units to a home-like yard.

214.    All residents of Sunmount are considered inpatients and admitted to the facility on a legal status.

215.    H.L. is on a non-objecting status.  S*ee* MHL § 15.25.

216.    H.L. does not want to continue living in an institution and seeks to be placed in a certified residential opportunity and receive HCBS Waiver services.

217.    H.L. resides on the LIT.

218.    H.L. was recommended for a community residential opportunity by his Sunmount treating clinicians on June 6, 2016.

219.    Because H.L. resides in a developmental center, classified as an "intermediate care facility" by the CMS he cannot obtain the HCBS Waiver services that he needs as long as he remains there.

220.    Upon his discharge from Sunmount and admission to an OPWDD certified residential opportunity H.L. will be eligible to receive HCBS Waiver services.

221.    The community services H.L. requires include residential, day habilitation, service coordination, transportation, medical and psychiatric services, nursing and dietician specialists, and sign language interpreting.

222.    H.L. has been referred to at least 33 OPWDD certified voluntary agencies for community placement and all of the voluntary agencies have rejected his community referral application.

223.    H.L. has been referred to at least two state operated community placements and both state operated providers rejected his community referral application.

224.    Remaining at Sunmount causes H.L. harm.

225.    As a resident of an institution, H.L. is subjected to the stigma that often attaches to those who are separated from society to receive care and treatment in an institution.

226.    Living in an institution creates isolation and curtails H.L.'s life experiences- including family relations, social contacts, work opportunities, economic independence, and cultural enrichment.

227.    Because Sunmount is located in Tupper Lake, H.L. is isolated from his family, who reside in New York City.  He only sees his family a few times each year on supervised home visits.

There is no public transportation to Tupper Lake, making it nearly impossible for family and friends to visit H.L. at Sunmount.

228.    H.L. has also experienced neglect and inadequate oversight of his clinical needs.

229.    For example, despite being deaf, H.L. was denied sign language interpreting services commencing in March of 2020 and for a period of sixteen months.

230.    During this time period, H.L. attended ten medical appointments and six treatment team meetings without an interpreter.

231.    There is currently no interpreter serving H.L. at Sunmount.

232.    Thus, H.L. must rely exclusively on remote interpreting services.

### 6.    Plaintiff A.B.

233.    A.B. is a 28-year-old man who is a resident of New York State.

234.    A.B. wants to live in a community-based home where he can receive the services he needs to maximize his independence.

235.    A.B. has lived at Sunmount since May 7, 2014.

236.    A.B. is diagnosed with mild intellectual disability, schizophrenia, autism spectrum disorder, and a provisional diagnosis of Post-Traumatic Stress Disorder.

237.    Sunmount records indicate that A.B. has "adequate" communication skills.  He maintains good eye contact in conversation and communicates clearly.

238.    A.B. is at Sunmount on a non-objecting status and resides on the LIT.

239.    A.B. does not want to continue living in an institution and seeks a certified residential opportunity and HCBS Waiver services.

240.    Because A.B. resides in a developmental center, he cannot obtain the HCBS Waiver services that he needs as long as he remains there.

241.    Upon his discharge from Sunmount and admission to an OPWDD certified residential opportunity, A.B. will be eligible to receive HCBS Waiver services.

242.    The community services A.B. requires include residential, day habilitation, service coordination, transportation, medical, nursing, and psychiatric services.

243.    A.B. was recommended for certified residential opportunity by his Sunmount treating clinicians on July 9, 2020.

244.    A.B. was screened and denied services by two voluntary agencies in 2020.  No community screenings occurred in calendar year 2021.

245.    Remaining at Sunmount causes A.B. harm.

246.    As a resident of an institution, A.B. is subjected to the stigma that often attaches to those who are separated from society to receive care and treatment in an institution.

247.    Living in an institution creates isolation and curtails A.B.'s life experiences-including family relations, social contacts, work opportunities, economic independence, and cultural enrichment.

248.    There is no public transportation to Tupper Lake, making it nearly impossible for family and friends to visit A.B. at Sunmount.

### 7.    Plaintiff J.S.

249.    J.S. is a 25-year-old man who is a resident of New York State.

250.    J.S. wants to live in a community-based home where he can receive the services he needs to maximize his independence.

251.    J.S. was admitted to Sunmount from an OPWDD licensed community residence on December 7, 2017.

252.    J.S. is diagnosed with autism spectrum disorder.

253.    Historically, he has also been diagnosed with a mood disorder.  J.S. also has insulin-dependent diabetes.

254.    J.S. has receptive and expressive language ability described as functional for his communication environment. He is able to understand simple conversation, follow verbal directions, and make his wants and needs known to others.

255.    J.S. was originally admitted to Sunmount on an involuntary legal status.  MHL § 15.27.

256.    On February 5, 2019, Judge Peter Feldstein, (now retired), an Acting Supreme Court Justice of the Franklin County Supreme Court, issued an order denying Sunmount's application for continued retention.  The February 5, 2019 court order stayed the release of J.S. until April 15, 2019 for discharge planning.  Despite the February 5, 2019 court order, J.S. remains at Sunmount.

257.    J.S. resides on the LIT.

258.    J.S. does not want to continue living in an institution and seeks a certified residential opportunity and HCBS Waiver services.

259.    Because J.S. resides in a developmental center, he cannot obtain the HCBS Waiver services that he needs as long as he remains there.

260.    J.S. was recommended for a certified residential opportunity by his Sunmount treating clinicians on April 17, 2018.

261.    He is on a referral list for regions two & three maintained by OPWDD.

262.    J.S. has been screened and denied services by at least thirteen voluntary agencies.

263.    OPWDD State operations also screened and denied J.S.'s application for a certified residential opportunity on November 7, 2018.

264.    Remaining at Sunmount causes J.S. harm.

265.    As a resident of an institution, J.S. is subjected to the stigma that attaches to those who are separated from society to receive care and treatment in an institution.

266.    Living in an institution creates isolation and curtails J.S.' life experiences-including family relations, social contacts, work opportunities, economic independence, and cultural enrichment.

267.    There is no public transportation to Tupper Lake, which makes it difficult for family and friends to visit J.S. at Sunmount.

268.    J.S. routinely expresses his frustration about remaining at Sunmount and he desires to be restored to community living in an OPWDD operated or certified residence.

### 8.    Plaintiff M.L.

269.    M.L. is a 32-year-old woman who is a resident of New York State.

270.    M.L. wants to live in a community-based home where she can receive the services she needs to maximize her independence.

271.    M.L. was admitted to Sunmount on October 22, 2012.

272.    M.L. is on a non-objecting status.

273.    M.L. is diagnosed with mild intellectual disability, childhood traumatic brain injury, bipolar disorder, post-traumatic stress disorder, and borderline personality disorder.

274.    M.L. is a qualified individual with a disability.

275.    M.L. is able to communicate her wants and needs.

276.    M.L. resides on the LIT.

277.    M.L. does not want to continue living in an institution and seeks a certified residential opportunity and HCBS Waiver services.

278.    Because M.L. resides in a developmental center, she cannot obtain the HCBS Waiver services that she needs as long as she remains there.

279.    M.L. was recommended for a certified residential opportunity by her Sunmount treating clinicians on November 30, 2020.

280.    M.L. is on the statewide referral list maintained by OPWDD.

281.    M.L. was accepted for admission to an IRA operated by the voluntary agency Crystal Run Village, Inc. ("CRVI") on March 31, 2022.

282.    On May 27, 2022, M.L. was informed that the voluntary agency that had accepted her for a residential opportunity, CRVI, rescinded the offer.

283.    M.L. was afforded no opportunity to appeal the decision by CRVI to rescind its offer to serve M.L. in the community.

284.    Remaining at Sunmount causes M.L. harm.

285.    As a resident of an institution, M.L. is subjected to the stigma that attaches to those who are separated from society to receive care and treatment in an institution.

286.    Living in an institution creates isolation and curtails M.L.'s life experiences-including family relations, social contacts, work opportunities, economic independence, and cultural enrichment.

287.    There is no public transportation to Tupper Lake, which makes it extremely difficult for family and friends to visit M.L. at Sunmount.

288.    M.L. routinely expresses her frustration about remaining at Sunmount and she desires to be afforded community residential and HCBS Waiver services.

**B.     *The Crisis For The Plaintiff Class***

289.     The members of the putative class are individuals diagnosed as having developmental disabilities that substantially limit one or more major life activities.  Because of their disabilities they require support in order to lead healthy lives in the community.

290.     Plaintiffs and members of the putative class are "qualified individuals with disabilities" as defined by the ADA and its implementing regulations.

291.     Plaintiffs and members of the putative class share a desire to leave the institutional settings in which they are currently confined.  They wish to live in community-based certified residential opportunities where they can receive the Medicaid-funded HCBS Waiver services that will enable them to maximize their independence.

292.     Plaintiffs and members of the putative class are, by definition, eligible to receive HCBS Waiver services and a certified residential opportunity.

293.     Defendants are failing to provide Plaintiffs and the putative class with HCBS Waiver services and certified residential opportunities.

294.     As a direct result of this failure, Plaintiffs and the putative class are suffering because they are unnecessarily institutionalized.

295.     Defendants categorize individuals waiting to receive HCBS Waiver services and a certified residential opportunity as either "emergency need," "substantial need," or "current need."

296.     These categorizations are meaningless and ineffective.

297.     Defendants fail to timely provide Plaintiffs and the putative class with HCBS Waiver services and certified residential opportunities regardless of their categorization.

298.     Defendants have not promulgated regulations or issued policies defining reasonable time periods or deadlines to provide HCBS Waiver services and certified residential opportunities related to any of the categories listed above.

36

299.     On April 28, 2022, in response to a FOIL request, Defendant OPWDD provided the Mental Hygiene Legal Service ("MHLS") with data related to the length of time it takes to provide HCBS Waiver services and certified residential opportunities. That raw data is summarized below.

300.     Between January 1, 2015, and October 31, 2021, OPWDD received 12,557 requests for HCBS Waiver services and certified residential opportunities.

301.     Of those 12,557 requests, 4,494 never resulted in a residential placement.

302.     Excluding requests that did not result in placement, the average time to provide a residential placement to an individual categorized as "emergency need" was 278 days.

303.     Excluding requests that did not result in placement, the average time to provide a residential placement to an individual categorized as "substantial need" was 385 days.

304.     Excluding requests that did not result in placement, the average time provide a residential placement to an individual categorized as "current need" was 312 days.

305.     Among the 3,959 requests categorized as "emergency need" for which a placement was eventually provided, 537 were resolved in 0-30 days, 1,822 within 1-6 months, 688 in 6 months to 1 year, 501 in 1-2 years, and 420 in 2 years or more.

306.     Among the 2,818 requests categorized as "substantial need" for which a placement was eventually provided, 226 were resolved in 0-30 days, 978 in 1-6 months, 559 in 6 months to 1 year, 569 in 1-2 years, and 493 in 2 years or more.

307.     Among the 1,286 requests categorized as "current need" for which a placement was eventually provided, 169 were resolved in 0-30 days, 471 in 1-6 months, 274 in 6 months to 1 year, 211 in 1-2 years, and 161 in 2 years or more.

308.     Because these averages are calculated solely based on requests that actually resulted in placements, they likely underestimate the true average periods of delay between when a request is made and fulfilled.  Including these requests in the overall calculation would raise the average time for all requests from 321 to 549 days.  However, because it is unknown how long it will take for these requests to actually result in placements, or if the individuals behind all of those requests are still seeking placements, these requests have not been factored into the given averages.

## II.     DEFENDANTS' RESPONSIBILITY FOR THE CRISIS

309.     As the "single state agency" that administers New York State's Medicaid program, DOH is required to ensure Medicaid recipients have access to the care and supports to which they are entitled.

310.     As the entity that administers New York State's HCBS Waiver program to individuals with developmental disabilities, OPWDD is responsible for ensuring that its recipients receive the HCBS Waiver services to which they are entitled.

311.     Collectively, Defendants are responsible for ensuring that Plaintiffs and members of the putative class are able to receive HCBS Waiver services and certified residential opportunities.

312.     Defendants are also responsible for ensuring that Plaintiffs and members of the putative class are not unnecessarily institutionalized.

313.     Defendants' methods of administering their programs fail to provide the putative class with HCBS Waiver services and certified residential opportunities; the result of this failure is that Plaintiffs and members of the putative class are unnecessarily institutionalized.

314.     Defendants' methods of administering their programs that provide HCBS Waiver services and certified residential opportunities are grossly ineffective and inadequate.

315.    There are not enough certified residential opportunities to accommodate all individuals who are eligible to receive them.  According to the data received by MHLS in response to their FOIL request, of the requests for residential placement received by OPWDD since 2015, 35.7% did not result in placement.

316.    Certified residential opportunities are primarily operated by voluntary private provider agencies.  Approximately 10% of them are operated by OPWDD directly.

317.    Regardless of whether they are operated privately or by OPWDD directly, providers of certified residential opportunities are given broad discretion about whether to accept specific individuals for placement.

318.    Defendants contend they cannot compel providers of certified residential opportunities to accept specific individuals.

319.    Because the system that Defendants have created gives providers of certified residential opportunities such broad discretion to decide who they accept, many individuals suffer unconscionable delays while waiting for a certified residential opportunity to *volunteer* to accept them.

320.    Because Defendants' methods of administering their programs result in widespread unnecessary institutionalization, these methods of administration constitute discrimination under the ADA and the Rehabilitation Act.

321.    New York State's *Olmstead* Plan (the "Plan") identifies four "areas of focus": (1) Transitioning People with Disabilities from Segregated Settings to the Community; (2) Assessment and Outcome Strategies to Advance Community Integration; (3) Supporting Community Integration for People with Disabilities; and (4) Ensuring Accountability for Community Integration.

322.   The Plan specifies that numerous "Developmental Centers" for people with intellectual and developmental disabilities will be closed in order to relocate residents to more integrated community settings.

323.   While the Plan recognizes "the need to build additional community capacity to support people with developmental disabilities," it fails to create any requirements for OPWDD or other state agencies to increase the number of residential placements, or to expand access to HCBS Waiver services.

324.   The Plan fails to offer any meaningful support to Plaintiffs' pursuit of community placements and services.

325.   On information and belief, New York State's *Olmstead* Plan has not been updated since 2013.

326.   On March 1, 2022, DRNY and MHLS sent Defendants a demand letter describing the crisis detailed in this class action complaint.

327.   The letter offered Defendants the opportunity to engage in structured negotiations to modify Defendants' system of administration to ensure people approved for community-based services are not languishing in institutional settings.

328.   On March 25, 2022, Defendants responded to the letter described above.

329.   While Defendants did offer to meet on a "semi-regular basis," they rejected any measurable or enforceable plan to ensure Plaintiffs and the putative class receive timely access to HCBS Waiver services and certified residential opportunities.

330.   Accordingly, Plaintiffs had no choice but to commence this litigation to ensure Plaintiffs and members of the putative class receive their federally mandated rights.

## CLASS ACTION ALLEGATIONS

331.    Named Plaintiffs T.C., A.H., R.D., J.D., H.L., A.B., J.S., and M.L. bring this action,

pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of themselves and as

representatives of a class of:

> **Individuals with disabilities who have been, or will be, determined by**
> **OPWDD to be eligible for HCBS Waiver services and certified residential**
> **opportunities, but remain institutionalized due to Defendants' failure to**
> **deliver these services.**

332.    Questions of fact common to the class include, but are not limited to, whether

Defendants have failed to provide Plaintiffs and members of the putative class with HCBS Waiver

services and certified residential opportunities to which they are entitled; and whether the Plaintiffs

and members of the putative class suffered unnecessary institutionalization as a result of

Defendants' failure to provide HCBS Waiver services and certified residential opportunities.

333.    Questions of law common to the class include, but are not limited to, whether

Defendants' failure to provide HCBS Waiver services and certified residential opportunities

violated the rights of Plaintiffs and members of the putative class under the Medicaid Act, its

implementing regulations, the ADA, and Section 504 of the Rehabilitation Act, and whether

Defendants have utilized methods of administration that result in Plaintiffs and members of the

putative class being unnecessarily institutionalized.

334.    The class is so numerous that joinder of all class members in this action would be

impracticable.  On information and belief, there are presently thousands of individuals in New

York State who are unnecessarily institutionalized because of Defendants' failure to provide

HCBS Waiver services and certified residential opportunities.

335.    It would be impracticable for potential plaintiffs, who are individuals with

developmental disabilities, to obtain legal services on an individual basis to bring their claims.

336.    As a result, the legal rights of members of the putative class may be rendered meaningless without the certification of a class action seeking common remedies.

337.    The claims of named Plaintiffs T.C., A.H., R.D., J.D., H.L., A.B., J.S., and M.L. are typical of the claims of the putative class members in that all of them have been determined eligible for HCBS Waiver services and certified residential opportunities that they have not received.   As a result, all Plaintiffs and putative class members continue to suffer unnecessary institutionalization.

338.    Named Plaintiffs will adequately represent the interests of the class.   Named Plaintiffs are members of the putative class and there are no conflicts of interest between named Plaintiffs and other putative class members.

339.    Named Plaintiffs and all putative class members would benefit from a declaration that Defendants have violated the Medicaid Act, the ADA, and Section 504 of the Rehabilitation Act.

340.    Named Plaintiffs and all putative class members would benefit from an injunction directing Defendants to provide them with HCBS Waiver services and certified residential opportunities to which they are entitled in a timely manner.

341.    Plaintiffs are represented by Disability Rights New York, Mental Hygiene Legal Service for the First and Third Judicial Departments, and Kasowitz Benson Torres LLP, attorneys who are experienced in class action litigation concerning Medicaid, the ADA, and the Rehabilitation Act.

## CAUSES OF ACTION

### COUNT I
**(Violation of the Reasonable Promptness Provision of the Medicaid Act,
42 U.S.C. § 1396a(a)(8))**

342.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs 1 through 341 as if fully set forth herein.

343.     Plaintiffs and the putative class are all eligible to receive HCBS Waiver services and certified residential opportunities.  Despite their eligibility, Plaintiffs and the putative class continue to wait months or even years to receive HCBS Waiver Services and certified residential opportunities.  By definition, HCBS Waiver services cannot be provided to Plaintiffs and the putative class while they remain institutionalized.

344.     Defendants have failed to provide HCBS Waiver services and certified residential opportunities in a timely manner.

345.     Defendants have failed to provide HCBS Waiver services and certified residential opportunities at all.

346.     Defendants' failure to provide Plaintiffs and the putative class with the HCBS Waiver services and certified residential opportunities to which they are undisputedly entitled, in a timely manner, violates the rights of Plaintiffs' and the putative class under the reasonable promptness provision of the Medicaid Act, 42 USC § 1396a(a)(8).

347.     Defendants' acts and omissions described above, while acting under color of state law, violate 42 U.S.C. § 1983 by depriving Plaintiffs and putative class of their statutory rights.

### COUNT II
**(Violation of the Freedom of Choice Provision of the Medicaid Act,
42 U.S.C. § 1396n(c)(2)(C))**

348.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs 1 through 347 as if fully set forth herein.

349.    Plaintiffs and the putative class are all eligible to receive HCBS Waiver services and certified residential opportunities.  Despite their eligibility, Plaintiffs and the putative class are given no meaningful opportunity to choose to receive HCBS Waiver services and certified residential opportunities, as opposed to remaining institutionalized, because Defendants have failed to operate programs that actually make these required services available.

350.    Because Defendants have failed to create or maintain feasible alternatives to institutional care they cannot inform Plaintiffs or the putative class of these alternatives, nor can they actually provide Plaintiffs or the putative class with any meaningful opportunity to choose to receive such alternatives, which violates the rights of Plaintiffs and the putative class under the freedom of choice provision of the Medicaid Act, 42 U.S.C. § 1396n(c)(2)(C).

351.    Defendants' acts and omissions described above, while acting under color of state law, violate 42 U.S.C. § 1983 by depriving Plaintiffs and putative class of their statutory rights.

### COUNT III
**(Violation of the Fair Hearing Requirement of the Medicaid Act,**
**42 U.S.C. § 1396a(a)(3))**

352.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs 1 through 351 as if fully set forth herein.

353.    Defendants are required to provide notice and the right to an administrative fair hearing whenever a claim for medical assistance is denied or not acted upon with reasonable promptness.  Defendants are specifically required to provide the opportunity for a fair hearing to any individuals "who are not given the choice of home and community-based services as an alternative to institutional care."

354.    Defendants have failed to act on the claims of Plaintiffs and the putative class for HCBS Waiver services with reasonable promptness, and have failed to provide Plaintiffs and the

putative class with a meaningful choice to receive home and community-based services as an alternative to institutional care.

355.     Defendants have also failed to provide Plaintiffs and the putative class with notice and the opportunity to request a fair hearing to challenge these adverse actions.  This failure violates the Medicaid Act, 42 USC § 1396a(a)(3).

356.     Defendants' acts and omissions described above, while acting under color of state law, violate 42 U.S.C. § 1983 by depriving Plaintiffs and putative class of their statutory rights.

<u>**COUNT IV**</u>
**(Discriminatory Segregation in Violation of the Americans With Disabilities Act, 42 U.S.C. § 12132)**

357.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs 1 through 356 as if fully set forth herein.

358.     The ADA provides that, "no qualified individual with a disability shall, by reason of such disability, be excluded from participating in or be denied the benefits of services, programs, or activities of a public entity." 42 U.S.C. § 12132.

359.     Defendants DOH and OPWDD are public entities covered by Title II of the ADA. Defendants are responsible for the operation of public entities covered by Title II of the ADA. 42 U.S.C. §§ 12131(1)(A) and (B).

360.     Plaintiffs and members of the putative class are individuals with disabilities. They have mental impairments that substantially limit one or more major life activity. Plaintiffs and members of the putative class are qualified individuals with disabilities within the meaning of 42 U.S.C. § 12131(2).

361.     Plaintiffs and the putative class are eligible to receive certified residential opportunities and HCBS Waiver services from Defendants.  Plaintiffs and the putative class do not object to receiving certified residential opportunities and HCBS Waiver services from Defendants.

Despite this, Defendants' acts and omissions have directly caused Plaintiffs and the putative class to remain institutionalized against their wishes.

362.    The Defendants are obligated under the ADA to administer New York State programs in a manner that enables Plaintiffs and the putative class to receive services in the most integrated setting appropriate to their needs. *See* 28 C.F.R. § 35.130(d).

363.    Defendants have failed to meet this obligation. Defendants fail to adequately implement and administer the State's HCBS Waiver Program for people with developmental disabilities. Defendants discriminate against Plaintiffs and the putative class by denying them the opportunity to receive the Medicaid services they need in integrated settings, causing them to remain unnecessarily segregated.

364.    Serving Plaintiffs and the putative class in more integrated settings would not fundamentally alter Defendants' programs.

365.    Defendants' failure to administer services, programs, and activities to Plaintiffs and the putative class in the most integrated setting appropriate to their needs violates Title II of the ADA as interpreted by 28 C.F.R. §§ 35.130(d), and 35.152(b)(2).

366.    Defendants' acts and omissions described above, while acting under color of state law, violate 42 U.S.C. § 1983 by depriving Plaintiffs and the putative class of their statutory rights.

### COUNT V
### (Discriminatory Methods of Administration in Violation of
### the Americans With Disabilities Act, 42 U.S.C. § 12131)

367.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs 1 through 366 as if fully set forth herein.

368.    The ADA prohibits a public entity from,

> directly or through contractual or other arrangements, utilize criteria
> or methods of administration: (i) That have the effect of subjecting
> qualified individuals with disabilities to discrimination on the basis

of disability; (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or (iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State. 28 C.F.R. § 35.130 (b)(3)

369.    Defendants design, fund, and operate the HCBS Waiver services delivery system.

370.    Defendants use methods of administration which subject Plaintiffs and the putative class to unnecessary institutionalization.

371.    Defendants' administration of the HCBS Waiver program fails to accomplish the objectives of the public entity's program to ensure access to HCBS Waiver services and certified residential opportunities for individuals with disabilities who do not want to be institutionalized.

372.    Defendants' failure to utilize methods of administration in a manner that supports the timely availability of services and programs in the most integrated setting for individuals with disabilities violates the rights of Plaintiffs and the putative class under the Americans with Disabilities Act, 42 U.S.C. § 12131, as interpreted by 28 C.F.R. § 35.130.

373.    Defendants' acts and omissions described above, while acting under color of state law, violate 42 U.S.C. § 1983 by depriving Plaintiffs and putative class of their statutory rights.

## <u>COUNT VI</u>
### (Violation of the Inclusion Mandate of the Rehabilitation Act, 29 U.S.C. § 794)

374.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs 1 through 373 as if fully set forth herein.

375.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides:

No otherwise qualified individual with a disability in the United States…shall, solely by reason of her or his disability, be excluded from participation in, be denied benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance.

376.     Defendants operate programs or activities that receive federal financial assistance for purposes of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(b), and its implementing regulations, 45 C.F.R. § 84.3(k).

377.     Plaintiffs and the putative class are individuals with disabilities that substantially limit one or more major life activity. Plaintiffs and the putative class are qualified individuals with disabilities within the meaning of 29 U.S.C. § 705(20).

378.     Plaintiffs and the putative class wish to receive HCBS Waiver services and certified residential opportunities which they have been determined to be eligible to receive.

379.     Plaintiffs and putative class members are qualified to receive services in the most integrated community-based settings that meet their health needs.

380.     Despite their undisputed eligibility for HCBS Waiver services, Defendants fail to actually provide such services.

381.     Defendants' failure to provide HCBS Waiver services and certified residential opportunities, and to adequately implement and administer the State's HCBS Waiver, is discriminatory toward Plaintiffs and the putative class because it causes them to be unnecessarily segregated, in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

382.     Defendants' acts and omissions described above, while acting under color of state law, violate 42 U.S.C. § 1983 by depriving Plaintiffs and putative class of their statutory rights.

## COUNT VII
### (Discriminatory Methods of Administration in Violation of the Rehabilitation Act, 29 U.S.C. § 794)

383.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs 1 through 382 as if fully set forth herein.

384.     Section 504 of the Rehabilitation Act provides that a:

"recipient may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap; [or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program or activity with respect to the handicapped persons…" 45 C.F.R. § 84.4(b)(4).

385.    Defendants designed, fund, and operate the HCBS Waiver delivery system.

386.    Defendants violate Section 504 of the Rehabilitation Act by using methods of administration that have the effect of subjecting Plaintiffs and the putative class to unnecessary institutionalization.

387.    Defendants' administration of the HCBS Waiver program fails to accomplish the objectives of the public entity's program to ensure access to HCBS Waiver services and certified residential opportunities for individuals with disabilities who do not want to be institutionalized.

388.    Defendant's failure to utilize methods of administration in a manner that supports the availability of services and programs in the most integrated setting for individuals with disabilities violates the rights of Plaintiffs and the putative class under Section 504 of the Rehabilitation Act.

389.    Defendants' acts and omissions described above, while acting under color of state law, violate 42 U.S.C. § 1983 by depriving Plaintiffs and putative class of their statutory rights.

### **RELIEF REQUESTED**

**WHEREFORE**, Plaintiffs respectfully request that this Court grant the following relief against Defendants including:

A.    Certifying this case as a class action, naming Plaintiffs as representatives of the class, and Plaintiffs' attorneys as class counsel to represent Class Members

pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure, with a class defined as "Individuals with disabilities who have been, or will be, determined by OPWDD to be eligible for HCBS Waiver services and certified residential opportunities, but remain institutionalized due to Defendants' failure to deliver these services;"

B.      Entering a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, that Defendants' failure to provide members of the class with timely HCBS Waiver services and certified residential opportunities violates the Medicaid Act, Title II of the ADA, and Section 504 of the Rehabilitation Act;

C.      Entering a permanent injunction requiring Defendants:

1.  To provide each of the Named Plaintiffs with HCBS Waiver services and certified residential opportunities within 60 days;

2.  To ensure the prompt provision of community-based residential opportunities and HCBS Waiver Services to all class members;

3.  To inform class members of alternatives to institutional care, and to provide them with a meaningful opportunity to access those alternatives;

4.  To ensure that their methods of administration do not cause unnecessary institutionalization;

5.   To provide notice and fair hearing rights to any class member who is not provided with HCBS Waiver services and certified residential opportunities to which they have been determined eligible with reasonable promptness;

6.    To provide notice and fair hearing rights to any class member who is not provided with a meaningful choice to receive HCBS Waiver services and certified residential opportunities as an alternative to an institutional placement.

D.      Ordering that Plaintiff DRNY may maintain this action pursuant to 42 U.S.C. § 15043(a)(2)(A)(i) and 42 U.S.C. § 10805(a)(1)(B).

E.      Awarding reasonable attorney's fees under 42 U.S.C. § 1988(b), 29 U.S.C. 794a(b), and 42 U.S.C. § 12205;

F.      Awarding costs and disbursements; and

G.      Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a trial by jury as to all matters so triable.

Dated:  June 16, 2022

**DISABILITY RIGHTS NEW YORK**

Benjamin Taylor (Bar No. BT7396)
Julie M. Keegan (Bar No. JK2828)
Alyssa Galea (Bar No. 5577762)
William Tronsor (Bar No. 5691373)
25 Chapel Street
Suite 1005
Brooklyn, New York, 11201
Telephone:  (518) 432-7861
ben.taylor@drny.org
julie.keegan@drny.org
alyssa.galea@drny.org
william.tronsor@drny.org

**MENTAL HYGIENE LEGAL SERVICE**
**FIRST JUDICIAL DEPARTMENT**
Sadie Z. Ishee (Bar No. SI9540)
Leonard D. Simmons (Bar No. LS6830)
41 Madison Avenue, 26th Floor
New York, NY 10010
Telephone: (646) 386-5891
sishee@nycourts.gov
ldsimmon@nycourts.gov

**MENTAL HYGIENE LEGAL SERVICE**
**THIRD JUDICIAL DEPARTMENT**
Sheila E. Shea, Director*
286 Washington Avenue Extension
Suite 205
Albany, NY 12203
Telephone: (518) 451-8710
sshea@nycourts.org

*pro hac vice to be submitted*

**KASOWITZ BENSON TORRES LLP**

By: */s/ David J. Abrams*
David J. Abrams (Bar No. DA4093)
David E. Ross (Bar No. DR5092)
Stephen P. Thomasch (Bar No. ST1225)
Andrew W. Breland (Bar No. 5691340)
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
dabrams@kasowitz.com
dross@kasowitz.com
sthomasch@kasowitz.com
abreland@kasowitz.com

*Attorneys for Plaintiffs*