UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____              │
│ DATE FILED:___12/15/2022_            │
└─────────────────────────────────────┘
```

---

T.C. et al.,

                                     Plaintiffs,

        -v-

NEW YORK STATE DEPARTMENT OF
HEALTH et al.,

                                     Defendants.

---

No. 22-cv-5045 (MKV)

OPINION & ORDER DENYING
MOTION FOR
PRELIMINARY INJUNCTION

MARY KAY VYSKOCIL, District Judge:

        Four months after initiating this case without seeking emergency relief, Plaintiffs filed a

motion for a preliminary injunction.  Plaintiffs are individuals with intellectual and developmental

disabilities who currently live in institutions and are awaiting placements in community residences,

along with other Medicaid-funded support services.  There is no dispute that Plaintiffs are free to

leave the institutions, although they might not receive appropriate care if they do so.  Plaintiffs

assert statutory and constitutional claims against Defendants based on their failures thus far to find

placements for Plaintiffs.

        Defendants are the New York State Department of Health ("DOH"), Mary Bassett in her

official capacity as Commissioner of DOH, the New York State Office for People with

Developmental Disabilities ("OPWDD"), and Kerri Neifeld in her official capacity as

Commissioner of OPWDD.  Both sides agree that each plaintiff is eligible and entitled to move to

a community-based Certified Residential Opportunity ("CRO") and receive services funded by the

Medicaid Home and Community Based Services Waiver ("HCBS Waiver").  Once an individual

is deemed eligible for a placement in a community residence, OPWDD makes referrals on behalf

of that individual to a network of voluntary and state-operated residential providers.  A key fact in this case is that a residential provider, whether voluntary or state-operated, must agree to accept a particular individual.

The gravamen of Plaintiffs' case is that Defendants have taken an unreasonably long time to provide the placements and services to which Plaintiffs are entitled.  As discussed below, the Medicaid Act requires States to provide services to those who are eligible with reasonable promptness.  Plaintiffs allege that there are thousands of vacancies in community residences and that OPWDD has an enormous budget.  Yet Plaintiffs have remained in institutions, awaiting placements, for long periods—from eight months to, in one case, five years—after Defendants deemed Plaintiffs eligible to move.  Plaintiffs contend it is unreasonable of Defendants to maintain a system in which providers with vacancies, including state-operated providers, may refuse to accept individuals for placements.

Defendants respond that OPWDD has made diligent efforts to place each plaintiff in an appropriate community residence.  Defendants offer evidence that Plaintiffs present with complex clinical needs, behavioral challenges, medical requirements, and geographic preferences that must be taken into account.  In many instances, a provider has concluded that it could not accept a given plaintiff and keep its other residents safe.  Defendants stress that meeting Plaintiffs' demand for immediate placements in community residences would require a fundamental alteration of the State's system because it would require the State to override providers' professional judgments.  As discussed below, the law is clear that an individual with a disability is entitled to receive services in the most integrated setting appropriate to his or her needs, but a State is not required fundamentally to alter the nature of its program to accommodate that individual.  Defendants also

stress that their placement efforts are ongoing.  Indeed, Defendants have found placements for three of the ten named plaintiffs who have appeared in this action.

For the reasons set forth below, Plaintiffs' motion for a preliminary injunction is DENIED. However, it is not reasonable for Defendants to fail indefinitely to find placements for Plaintiffs. Accordingly, by January 30, 2023, Defendants must file an affidavit detailing what further steps they have taken to place each plaintiff since November 2022.

## I.     BACKGROUND

### A.  Procedural History

#### 1.  Plaintiffs Initiate this Action Without Seeking Emergency Relief.

Plaintiffs initiated this putative class action by filing a complaint on June 16, 2022 [ECF No. 1].  Plaintiffs did not seek emergency relief at that time.  Nor did Plaintiffs assert constitutional claims when they filed the original complaint.

As noted above, most of the plaintiffs are individuals with intellectual and developmental disabilities, although an organization named Disability Right New York ("DRNY") is also appearing as a plaintiff.  Several of the individual plaintiffs are appearing through a next friend. Shortly after filling the original complaint, Plaintiffs filed an unopposed motion for the individuals with disabilities and their next friends to proceed anonymously, and the Court granted that motion [ECF Nos. 30, 42].  The original complaint named as plaintiffs: (1) T.C., appearing through his next friend D.S.; (2) A.H., appearing through her next friend E.H.; (3) R.D., appearing through her next friend M.D.; (4) J.D., appearing through his next friend D.D.; (5) H.L.; (6) A.B.; (7) J.S.; and (8) M.L, as well as DRNY.

On August 12, 2022, Defendants filed a pre-motion letter seeking leave to file a motion to partially dismiss the original complaint, pursuant to Federal Rules of Civil Procedure 12(b)(1) and

12(b)(6), arguing that the claims against the individual defendants are duplicative, DRNY lacks

standing, and Plaintiffs fail to state claims under the Medicaid Act [ECF No. 31].  Plaintiffs first

filed a letter responding to Defendants' arguments in the pre-motion letter [ECF No. 32].  Plaintiffs

then filed another letter informing the Court of their intention to file an amended complaint as of

right [ECF No. 34].

### 2.  Plaintiffs File the Amended Complaint.

On October 14, 2022, Plaintiffs filed the Amended Complaint [ECF No. 35 ("AC")].  The

Amended Complaint removed Plaintiffs T.C. and M.L. from this lawsuit because—as Plaintiffs

later acknowledged—OPWDD had by then placed T.C. and M.L. in community residences.  The

Amended Complaint added two new plaintiffs, J.C.M. and L.P., appearing through her next friend

C.P.  Plaintiffs also added two constitutional claims, asserting that Defendants are denying

Plaintiffs a hearing and imposing restraints on Plaintiffs' liberty in violation of the Due Process

Clause of the Fourteenth Amendment.  AC ¶¶ 432–445.

Plaintiffs assert nine causes of action in the Amended Complaint.  First, Plaintiffs allege

that Defendants' failures thus far to provide Plaintiffs, and a putative class, with Certified

Residential Opportunities and HSBC Waiver services (which cannot be provided while Plaintiffs

remain in institutions) violate the "reasonable promptness" provision of the Medicaid Act, 42

U.S.C. § 1396a(a)(8), and 42 U.S.C. § 1983.  AC ¶¶ 384–389.  Second, Plaintiffs allege that

Defendants' failures thus far to make community residences and HSBC Waiver services available

as an alternative to continued institutionalization violates the "freedom of choice" provision of the

Medicaid Act, 42 U.S.C. § 1396n(c)(2)(C), and Section 1983.  AC ¶¶ 390–393.  Third, Plaintiffs

allege they are being denied the right to an administrative hearing under the Medicaid Act, 42

U.S.C. § 1396a(a)(3).  AC ¶¶ 394–398.  Fourth, Plaintiffs allege that they are being discriminated

against and unnecessarily segregated in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and its "integration mandate," 28 C.F.R. § 35.130(d).  AC ¶¶ 399–408.  Fifth, Plaintiffs allege that Defendants' methods of administering the HSBC Waiver program are discriminatory, in violation of the ADA, 42 U.S.C. § 12132.  AC ¶¶ 409–415.  Sixth, Plaintiffs allege violation of the inclusion mandate of the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations.  AC ¶¶ 415–424.  Seventh, Plaintiffs allege discriminatory methods of administration in violation of the Rehabilitation Act, 29 U.S.C. § 794.  AC ¶¶ 425–431.  Eighth, Plaintiffs allege that they have a constitutionally protected interest in Medicaid-funded community residences and HSBC Waiver services and that Defendants are denying Plaintiffs a hearing on the denial of those benefits in violation of the Due Process Clause of the Fourteenth Amendment.  AC ¶¶ 432–438.  Ninth, Plaintiffs allege that, because they live in institutions while they await placements in community residences, Defendants are violating Plaintiffs' constitutional rights to be free from bodily restraint.  AC ¶¶ 439–445.

### 3.  Plaintiffs Seek Emergency Relief.

On October 20, 2022, four months after they initiated this action, Plaintiffs filed a motion for a preliminary injunction [ECF Nos. 37, 38 ("Pl. Mem."), 39, 40].  In their motion, Plaintiffs requested only "an order requiring Defendants *promptly* to secure placement in a community-based certified residential opportunity for Plaintiffs to allow them to receive the Home and Community Based Waiver services to which they are entitled" [ECF No. 37 (emphasis added)].  Plaintiffs did not submit a proposed order or offer in their motion papers any more detailed explanation of the requested relief.

The next day, October 21, 2022, Defendants filed a letter requesting an extension of time to respond to Plaintiffs' motion, from November 3 to November 17, 2022, citing the need to confer

with client agencies and "investigate Plaintiffs' claims as to each of the eight Named Plaintiffs, two of whom only recently joined this case" [ECF No. 41].  Defendants explained that they asked for Plaintiffs' consent to the extension, and Plaintiffs responded, "although we are sympathetic to your position, we cannot consent to any delays as it is our position that the Plaintiffs are suffering and need relief as soon as possible."  The Court denied Defendants' request for an extension but noted Plaintiffs' failure to request expedited briefing, "despite their position that Plaintiffs are suffering irreparable harm that requires emergency relief" [ECF No. 43].

Thus, following the ordinary briefing schedule in Local Rule 6.1(b), Defendants filed their opposition to Plaintiffs' motion on November 3, 2022 [ECF No. 46 ("Def. Opp."), 47, 48, 49, 50, 51, 52, 53, 54].  Defendants included detailed affidavits setting forth Defendants' efforts, thus far, to place each plaintiff in a community residence.  Plaintiffs filed their reply on November 10, 2022 [ECF No. 55 ("Pl. Reply")].

### 4.  The Court Holds a Hearing on Plaintiffs' Motion for Emergency Relief.

On November 17, 2022, the Court held a hearing on Plaintiffs' motion for a preliminary injunction.  The Court asked Plaintiffs why they waited so long after initiating this action to move for a preliminary injunction and, once they did move, failed to request expedited briefing on their motion, given Plaintiffs' position that every additional day their clients spend in institutions causes them irreparable harm.  Tr. at 6:18–19.  Plaintiffs responded that the "practical realities" of dealing with their clients precludes expedition, and the Court observed that Plaintiffs were echoing some of Defendants' arguments about why Defendants have not yet placed Plaintiffs in community residences.  Tr. at 6:21–7:9, 9:3–7.  Plaintiffs argued that, in any event, irreparable harm is uncontested in this case because Plaintiffs assert constitutional claims.  Tr. at 14:5–15.  Defense counsel later agreed.  *See* Tr. at 32:2–6.

On the record at the hearing, Plaintiffs acknowledged that T.C. and M.L. were removed from the lawsuit after the filing of the original complaint because "they were placed in suitable community-based residences." Tr. at 11:7–18. Plaintiffs also acknowledged that—as Defendants had represented in their opposition papers—Plaintiff A.B., who is named in the Amended Complaint, has now been accepted for placement in a CRO. Tr. at 11:24–12:2; *see* Scholl Decl. ¶¶ 9–10. Plaintiffs further acknowledged that "the defendants are endeavoring to meet their obligations" to place each named plaintiff in a CRO but stated that Plaintiffs' "position is that the law requires outcomes and not merely efforts." Tr. at 12:18–22.

When the Court asked Plaintiffs what specifically the Court should order Defendants to do, Plaintiffs initially responded that the Court should order Defendants only "to take additional efforts" to find placements for the named plaintiffs. Tr. at 15:20–21. The Court pressed Plaintiffs about the nature of the relief sought, since Plaintiffs conceded that Defendants had been making efforts to place each plaintiff, and the "fundamental problem" was that residential providers were deciding they could not serve these individuals. Tr. at 19:8. Plaintiffs ultimately requested an order directing Defendants to place each plaintiff in a CRO within 14 days, or, if Defendants are unable to do so, to "come back to this Court to detail their efforts to try to obtain such a placement for them and to detail why" each plaintiff was "not appropriate for any of the" residential providers operated directly by the State. Tr. at 17:9–19; *see* Tr. at 10:7–17; 15:13–25; 17:6–8). Plaintiffs further argued that "OPWDD has to be the provider of last resort." Tr. at 22:8–9. In other words, Plaintiffs contend that if no voluntary provider of residential services agrees to accept a particular individual, Defendants should compel one of the State-operated residential providers to accept the individual, even if that facility represents that it cannot safely serve the individual, as well as its other residents. Tr. at 22:8–9.

Defendants argued they had already submitted affidavits detailing the diligent efforts of OPWDD to place each plaintiff in an appropriate community residence, as well as reasons that State-operated facilities with vacancies had given for refusing to accept them.  Tr. at 37:11–38:16. Defendants stressed that "these particular plaintiffs are complex cases because they have a history of harming others."  Tr. at 34:24–25.  Defendants also stressed that, following their normal process, they found placements for three of the plaintiffs who have appeared in this action.  Tr. at 35:21– 23; *see* Tr. at 36:10–20.  In response to Plaintiffs' contention that Defendants should compel State-operated facilities to be a "provider of last resort," defense counsel said, "if that isn't a fundamental alteration of the system . . ., I don't know what is."  Tr. 38:17–24.

The Court pressed Defendants on "when" OPWDD would find community residences for the 7 remaining plaintiffs who had not been placed.  Tr. at 36:21.  Defense counsel said she could not answer that question.  *See* Tr. at 36:22–23.  During this colloquy, the Court noted that it is "not reasonable" for Defendants to say "I don't know, whenever," instead of providing "some working plan or some parameter" for placing Plaintiffs within a reasonable time.  Tr. at 37:3–5.

### 5.  Background Facts

Plaintiff A.H. is a 23-year-old woman who is hospitalized at Montefiore Hospital in the Bronx while she awaits placement in a community-based residence.  AC ¶ 11.  She is diagnosed with moderate intellectual disability and autism. AC ¶ 11.  She has also been diagnosed with Intermittent Explosive Disorder, which means she has "explosive outbursts of anger and violence." Hunt Decl. ¶ 23.  She was referred to OPWDD for a CRO placement on February 15, 2022.  Hunt Decl. ¶ 23.  She is classified as "emergency need" for a placement because she is in a hospital, and the hospital has deemed it unsafe for her to return home.  Hunt Decl. ¶ 23.  OPWDD has made referrals to 24 voluntary providers, and placement efforts are ongoing.  Hunt Decl. ¶ 28.  Various

providers have said they cannot accommodate A.H. because she exhibits aggressive behaviors, and, for example, the providers do not have the staff to care for A.H. and keep their "fragile" other residents safe.  Hunt Decl. ¶ 29.

Plaintiff R.D. is a 29-year-old woman who is living at Northeast Center for Rehabilitation and Brain Injury while she awaits placement in a community-based residence.  AC ¶ 12.  She is diagnosed with traumatic brain injury, mild intellectual disability, mood disorder, and anxiety.  AC ¶ 12.  She was referred to OPWDD for CRO placement on June 25, 2017, and OPWDD has made 13 referrals to providers on her behalf.  Bishi Decl. ¶ 12.  Placement efforts are ongoing.  Bishi Decl. ¶ 20–21.  However, thus far, providers have said they cannot accommodate R.D. because she requires an all-female caregiver staff and a single bedroom (as opposed to having a roommate); she exhibits dangerous and impulsive behaviors; she has a history of elopement; and she has a history of inappropriate sexual interactions with males.  Bishi Decl. ¶ 22.

Plaintiff J.D. is a 38-year-old man who is also living at Northeast Center for Rehabilitation and Brain Injury while she awaits placement in a community-based residence.  AC ¶ 13.  He is diagnosed with traumatic brain injury.  AC ¶ 13.  J.D. was referred to OPWDD for CRO placement on August 23, 2021, and OPWDD has made 14 referrals to providers on his behalf.  Coccodrilli Decl. ¶ 13.  As of the time Defendants filed their opposition, 4 referrals were pending, 9 providers determined that they were unable to serve J.D. for various reasons, and J.D.'s family declined one potential placement.  Coccodrilli Decl. ¶¶ 16, 19.

Plaintiff L.P. is a 36-year-old woman who is living at Valley Ridge Center for Intensive Treatment.  AC ¶ 14.  She is diagnosed with autism, mild intellectual disability, and schizoaffective disorder, as well as a chronic renal condition.  AC ¶ 14.  L.P. also has a history of harming herself and others, resulting in multiple criminal charges.  Coccodrilli Decl. ¶ 29.  L.P. was referred to

OPWDD for a CRO placement on November 1, 2021, OPWDD has made 31 referrals to providers on her behalf, and placement efforts are ongoing.  Coccodrilli Decl. ¶¶ 31, 33, 36.  Thus far, 25 providers have said they cannot serve L.P. because, among other reasons, the provider cannot meet L.P.'s staffing ratio requirements, cannot administer her medications, or cannot manage her aggressive behavior.  Coccodrilli Decl. ¶¶ 33, 35.  L.P.'s family also imposed a geographic limitation on potential placements.  Coccodrilli Decl. ¶ 32.

"Plaintiff J.C.M. is a 33-year-old transgender woman who is currently living at Montefiore Hospital" in the Bronx while awaiting placement in a CRO.  AC ¶ 15.  J.C.M. is diagnosed with intellectual disability, schizophrenia, and schizoaffective disorder, as well as asthma and pre-diabetes.  AC ¶ 15.  J.C.M. was referred to OPWDD for CRO placement on May 25, 2021,[1] OPWDD has since made 21 referrals to providers on behalf of J.C.M., and placement efforts are ongoing.  Hunt Decl. ¶¶ 9, 13, 16, 20.  A number of providers have said they cannot manage J.C.M.'s psychiatric symptoms, which include aggressive and self-harming behaviors, or cannot administer the injectable medications J.C.M. requires.  Hunt Decl. ¶¶ 11, 17.  Another obstacle to placement has been J.C.M.'s stated desire to drink alcohol and use marijuana in J.C.M.'s new home.  Hunt Decl. ¶¶ 16, 17.

Plaintiff H.L. is a 57-year-old man who is living at Sunmount Developmental Center while awaiting placement in a CRO.  AC ¶ 16.  He is diagnosed with bipolar disorder, autism spectrum disorder, and mild intellectual disability, and he is deaf.  AC ¶ 16.  Defendants submit evidence that H.L. has also been "diagnosed with Pedophilia" and has a history of attempting to engage in

---

[1] After the May 2021 referral, J.C.M. previously decided J.C.M. did not want to remain in the hospital awaiting a placement, and, after a judge determined J.C.M. did not meet the standard for involuntary hospitalization, J.C.M. voluntarily checked out.  AC ¶ 217; *see also* AC ¶ 216.  J.C.M. was then homeless and repeatedly "presented at psychiatric emergency rooms . . . seeking assistance."  AC ¶ 218.  J.C.M. has been back in the hospital since December 2021.  AC ¶ 219,

sexual conduct with vulnerable, lower functioning peers who seem child-like.  Hunt Decl. ¶¶ 34, 37.  He was referred to OPWDD in May 2018, OPWDD has made approximately 30 referrals to providers, and placement efforts are ongoing.  Hunt Decl. ¶ 39.  Various providers have refused to accept H.L. because it would be unsafe for their other residents, in part because H.L. is much more high functioning than their other residents.  *See* Hunt Decl. ¶ 40.

Plaintiff A.B. is a 28-year-old man who is also living at Sunmount.  AC ¶ 17.  He is diagnosed with mild intellectual disability, schizophrenia, and autism, and he has a provisional diagnosis of Post-Traumatic Stress Disorder.  AC ¶ 17.  A.B. was referred to OPWDD for CRO placement on September 1, 2020, OPWDD made 6 referrals on his behalf, and A.B. was accepted for placement by a voluntary provider called Family Residences and Essential Enterprises, Inc. ("FREE").  Scholl Decl. ¶¶ 9–10.

Plaintiff J.S. is a 25-year-old man living at Sunmount who is diagnosed with autism and diabetes.  AC ¶ 18.  J.S. was admitted to Sunmount after he was charged with a felony for assaulting a female staff member at a group home.  Millard Decl. ¶ 4.  At Sunmount, J.S. has assaulted others, and it has required interventions by up to four staff members at a time to stop him.  Millard Decl. ¶ 9.  He was referred to OPWDD for a CRO placement on June 27, 2018, OPWDD has since made 33 referrals to providers, and placement efforts are ongoing.  Millard Decl. ¶¶ 6, 14–25.  Providers have said they cannot safely serve J.S. because they do not have enough staff who can stop his assaults or do not have nursing staff who can administer his daily injections for diabetes. Millard Decl. ¶¶ 15–25.  J.S.'s family also limited the geographic area for his potential placements.  Millard Decl. ¶ 12.

## II.      LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy." *Moore v. Consol. Edison Co.*, 409 F.3d 506, 511 (2d Cir. 2005). "When, as here, a preliminary injunction 'will affect government action taken in the public interest pursuant to a statute or regulatory scheme,' the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016) (quoting *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011)). "The burden is even higher on a party . . . that seeks 'a mandatory preliminary injunction that alters the status quo by commanding some positive act, as opposed to a prohibitory injunction seeking only to maintain the status quo.'" *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (quoting *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010)). "A mandatory preliminary injunction 'should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" *Cacchillo*, 638 F.3d at 406 (quoting marks *Citigroup Global Mkts.*, 598 F.3d at 35 n.4).

## III.      DISCUSSION

Plaintiffs have not met their heavy burden to show clearly that they are entitled to emergency relief. In particular, Plaintiffs have not made a clear showing that they are likely to succeed on the merits of any of their claims. Before analyzing those claims, the Court briefly comments on whether Plaintiffs have met their burdens to show that Plaintiffs will suffer irreparable harm absent injunctive relief and that the public interest weighs in favor of granting the injunction Plaintiffs seek.

### A.  Irreparable Harm

As noted above, Defendants do not contest the issue of irreparable harm.  *See* Tr. at 32:2–3.  Nevertheless, a showing of irreparable harm is a prerequisite for the issuance of a preliminary injunction.  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).  And Plaintiffs have the burden to "demonstrate that *absent a preliminary injunction*," they will suffer imminent harm.  *Id.* (emphasis added).  The record before the Court is at best mixed with respect to Plaintiffs' showing of irreparable harm.

To be sure, the Supreme Court has recognized that "confinement in an institution severely diminishes the everyday life activities of individuals."  *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 601 (1999).  There is also non-binding authority for the proposition that any excess time spent in an institution constitutes irreparable harm.  *See Fair Hous. Just. Ctr., Inc. v. Cuomo*, No. 18-cv-3196 (VSB), 2018 WL 4565152, at *16 (S.D.N.Y. Sept. 24, 2018); *see also Long v. Benson*, 2008 WL 4571903, at *2 (N.D. Fla. Oct. 14, 2008), *aff'd*, 383 F. App'x 930 (11th Cir. 2010).  As the Court made clear on the record at the hearing on Plaintiffs' motion, the Court does not doubt that the named plaintiffs are suffering.  *See* Tr. at 15:23.

However, Plaintiffs initiated this lawsuit without seeking emergency relief in June 2022 [ECF No. 1].  Plaintiffs did not move for a preliminary injunction until four months later, in October 2022 [ECF Nos. 37, 38, 39, 40].  Moreover, Plaintiffs filed their motion only after Defendants sought leave to file a motion to dismiss, and Plaintiffs filed the Amended Complaint [ECF Nos. 31, 35].  As Plaintiffs acknowledged on the record at the hearing, they removed two named plaintiffs because those individuals had been placed in community residences. *See* Tr. at 11:7–18.  Plaintiffs also added constitutional claims to the Amended Complaint, even though the gravamen of the factual allegations remained the same.

It is well established that a plaintiff's significant delay in seeking a preliminary injunction can undermine the argument that the plaintiff will suffer irreparable harm absent preliminary relief. *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276–77 (2d Cir. 1985). Moreover, Plaintiffs must establish a likelihood that they will suffer imminent harm "absent" the preliminary relief they seek. *Faiveley Transp. Malmo AB*, 559 F.3d at 118. However, since the filing of the original complaint, Defendants have already found placements for three of the ten named plaintiffs who have appeared in this lawsuit (T.C., M.L., and A.B.) without an injunction.

Furthermore, it is far from clear that the injunction Plaintiffs request would prevent the harm they face. Indeed, an order requiring Defendants "promptly" to provide the remaining named plaintiffs with the services to which they are entitled [ECF No. 37] arguably is tantamount to "a simple command that the defendant obey the law," which would violate the specificity and clarity requirements for injunctions set forth in Rule 65(d) of the Federal Rules of Civil Procedure. *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240 (2d Cir. 2001). Only after the Court pressed Plaintiffs, several times, about the nature of the relief sought did Plaintiffs suggest an order requiring Defendants either to place Plaintiffs within 14 days, or to detail why each unplaced plaintiff is not appropriate for any of the State-operated providers with a vacancy. *See* Tr. at 10:7–17; 15:13–25; 17:6–19. Defendants responded that they had already provided such information in connection with their opposition. Tr. at 37:11–38:16. In reality, only an order requiring Plaintiffs' immediate placements in community residences, over the objections of residential providers, could prevent the imminent, irreparable harm that Plaintiffs allege—namely, additional days spent in institutions while Plaintiffs await placements.

Notwithstanding the record in this case, the Court is obliged to make a finding that Plaintiffs carried their burden to demonstrate that they will suffer imminent harm, unless the Court

issues the hollow order they requested, simply because Plaintiffs added constitutional claims to the Amended Complaint shortly before Plaintiffs filed a motion for emergency relief.  As both sides in this case acknowledge, the Second Circuit has held that ***any*** alleged violation of a constitutional right triggers a finding—not merely a rebuttable presumption—of irreparable harm, irrespective of the likely merits of the constitutional claim.  *See Connecticut Department of Environmental Protection v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996).

It makes little sense that a party can, in effect, manufacture a finding of irreparable harm by asserting a meritless constitutional claim.  This approach is out of step with other circuits.  *See, e.g.*, *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir. 1989); *Manning v. Hunt*, 119 F.3d 254, 264 (4th Cir. 1997); *Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680, 682 (7th Cir. 2012); *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000); *Sweis v. U.S. Foreign Claims Settlement Commission*, 950 F. Supp. 2d 44, 48 (D.D.C. 2013) ("our Court of Appeals has indicated that merely raising a constitutional claim is insufficient to warrant a presumption of irreparable injury").  Moreover, district courts in this Circuit often, understandably, reason that "the mere assertion of a constitutional injury is insufficient to automatically trigger a finding of irreparable harm."  *Smith v. Fredrico*, 2013 WL 122954, at *6 (E.D.N.Y. Jan. 8, 2013).  *See Frey v. Bruen*, 2022 WL 522478, at *9 (S.D.N.Y. Feb. 22, 2022); *Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 227 (D. Conn. 2020); *Joglo Realties, Inc. v. Seggos*, 2016 WL 4491409, at *16 (E.D.N.Y. Aug. 24, 2016); *Donohue v. Paterson*, 715 F. Supp. 2d 306, 315 (N.D.N.Y. 2010); *Turley v. Giuliani*, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000).  Applying Second Circuit precedent, however, the Court finds that Plaintiffs prevail on the issue of irreparable harm based on Plaintiffs' strategic assertion of constitutional claims on which they cannot prevail.

### B. Public Interest

Plaintiffs have not made a clear showing that the public interest favors granting Plaintiffs a preliminary injunction. *See Friends of the E. Hampton Airport*, 841 F.3d at 143. As explained above, Plaintiffs have offered vague and shifting descriptions of the preliminary relief they seek. In all events, however, if the Court orders near-immediate placement of the 7 remaining plaintiffs, Defendants must place those plaintiffs in community residences over the objections of providers who concluded they could not safely serve both the plaintiff in question and the other residents the providers already had in their care. *See, e.g.*, Hunt Decl. ¶ 29 (citing a provider stating that, given A.H.'s aggressive behaviors, it could not care for A.H. and keep "fragile" other residents safe); Bishi Decl. ¶ 22 (citing a provider stating that R.D.'s "sexually inappropriate behaviors" could "endanger others in the home"); Coccodrilli Decl. ¶ 18 (citing a provider stating that it "could not safely provide J.D. with residential services); Coccodrilli Decl. ¶ 35 (citing evidence that several "State-operated homes" would not accept L.P. because other residents "would be vulnerable to assault"); Hunt Decl. ¶ 17 (quoting a provider stating "we do not feel we would be able to support" J.C.M. "in a manner safe to [J.C.M.] and the other residents"); Hunt Decl. ¶ 40 (citing a provider stating that accepting H.L. would put other residents "in a vulnerable position"); Millard Decl. ¶¶ 15–25 (citing providers stating they could not safely serve J.S.).

The Supreme Court has explained that courts should "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). This Court does not find that the public interest is served by placing the needs of Plaintiffs over the needs of other residents with whom they would be housed. Plaintiffs point out that, if they show of success on the merits of their constitutional and civil rights claims, the public interest is presumed to tip in their favor. Pl. Mem. at 24 (citing *Y.S. v. New York*

*City Dep't of Educ.*, 2021 WL 1164571, at *5 (S.D.N.Y. Mar. 26, 2021)).  As such, the Court turns to Plaintiffs' likelihood of success on the merits.

### B.  Likelihood of Success on the Merits

#### 1.  Plaintiffs' Medicaid Claims

##### a.  Reasonable Promptness

The Medicaid Act requires states to provide "medical assistance" with "reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8).  The parties dispute whether the "reasonable promptness" provision of the Medicaid Act is privately enforceable through Section 1983.  Pl. Mem. at 14–15; Def. Opp. at 17–18.  The Second Circuit has not recognized a private right of action under this provision.  However, every federal courts of appeals to consider the issue has concluded the "reasonable promptness" provision of the Medicaid Act is privately enforceable through Section 1983.  *See P.D., by his guardian H.D, v. Neifeld et al.*, 21-cv-6787 (CBA) [ECF No. 37 at 4–5] (E.D.N.Y. Nov. 23, 2022) (collecting cases).

Assuming the reasonable promptness provision is privately enforceable, Plaintiffs have not shown that Defendants have acted unreasonably.  Plaintiffs cite completely inapposite authorities for the proposition that "reasonable promptness" should be interpreted to mean "no more than 45 to 90 days." Pl. Mem. at 16.  But the regulation and out-of-circuit cases Plaintiffs cite are about only the timeframe for the initial determination whether an applicant is financially eligible for Medicaid at all.  *See* Pl. Mem. at 16; 42 C.F.R. § 435.912(c)(3); *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 448 (6th Cir. 2020).  Here, there is no dispute that Plaintiffs have already been deemed eligible for the services they seek.

Whether a given service is furnished with reasonable promptness "is ultimately 'governed by a test of reasonableness.'" *Hanley v. Zucker*, No. 15-cv-5958 (KBF), 2016 WL 3963126, at *3

(S.D.N.Y. July 21, 2016) (quoting a 2001 guidance letter issued by the Centers for Medicare and Medicaid Services in the U.S. Department of Health and Human Services). Defendants maintain that they have acted reasonably. Def. Opp. at 17–18. In particular, Defendants offer evidence of their diligent efforts to place each plaintiff. *See* Hunt Decl. ¶¶ 17, 29, 40; Bishi Decl. ¶ 22; Coccodrilli Decl. ¶¶ 35; Millard Decl. ¶¶ 15–25. There is no evidence of unreasonable delays in Defendants' efforts to place Plaintiffs.

Indeed, on the record at the hearing on Plaintiffs' motion for a preliminary injunction, Plaintiffs conceded that "the defendants are endeavoring to meet their obligations" to place each named plaintiff in a community residence. Tr. at 12:18–21. Plaintiffs argue that, notwithstanding Defendants' reasonable efforts, the lengths of time Plaintiffs have been waiting for placements are *per se* unreasonable. Pl. Mem. at 16. Plaintiffs contend that the "reasonable promptness" provision of the Medicaid Act requires "outcomes and not merely efforts." Tr. at 12:21–22.

To be sure, the statute commands that "[medical] assistance shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8); *see Ciaramella v. Zucker*, 2019 WL 4805553, at *10 (S.D.N.Y. Sept. 30, 2019) "once an individual becomes eligible, there cannot be an unreasonably long wait to acquire covered care"). And Plaintiffs have been waiting long periods for placements. But Plaintiffs have not provided any authority for the proposition that a sufficiently lengthy wait is unreasonable *per se*. On the record at this stage of the case, the Court cannot find that Plaintiffs have carried their burden to show that the delays have been unreasonable. Accordingly, the Court cannot find that Plaintiffs have shown a likelihood of success on the merits of their reasonable promptness claim.

###### b. Freedom of Choice

Plaintiffs also allege that Defendants are violating the Freedom of Choice provision of the Medicaid Act, 42 U.SC. § 1396n(c)(2)(C).  Plaintiffs content that provision confers not only the right to be informed of alternatives to long-term institutional care, but also the right to choose among those alternatives.  Pl. Mem. at 16 (citing 42 C.F.R. § 441.302(d)(2)).  Plaintiffs argue that they have, in effect, been denied the right to choose the alternative to long-term institutional care. Pl. Mem. at 17.

The text of Section 1396n(c)(2)(C) requires States to provide the federal government with "assurances" that "individuals who are determined to be likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility for the mentally retarded *are informed of the feasible alternatives, if available* under the waiver, *at the choice of such individuals*, to the provision of inpatient hospital services, nursing facility services, or services in an intermediate care facility for the mentally retarded . . . ."  42 U.S.C. § 1396n(c)(2)(C)) (emphasis added).  The text poses several problems for Plaintiffs' claim.  First, the statutory text invites the question whether this provision is privately enforceable, and the Second Circuit has not answered that question.  *See* Def. Opp. at 19.  Second, the text strongly suggests the State's obligation is to assure that individuals are "informed" of their entitlement to any available alternatives to institutionalization. 42 U.S.C. § 1396n(c)(2)(C).  This specific provision does not clearly speak to the State's obligation to provide such alternatives.  *Cf. Edelson v. Chapel Haven, Inc.*, 2017 WL 810274 (D. Conn. Mar. 1, 2017) (citing *Catanzano by Catanzano v. Wing*, 103 F.3d 223, 232 (2d Cir. 1996)).  Plaintiffs have not provided compelling authority to the contrary.

Finally, even if Section 1396n(c)(2)(C) itself obliges the State to provide alternatives to institutionalization, the obligation is to provide only "feasible" and "available" alternatives.  42

U.S.C. § 1396n(c)(2)(C).  As discussed above, Defendants offer evidence that, thus far, the vacancies in their network of residential providers have not been feasible and available alternatives for these particular plaintiffs.  Indeed, Defendants offer evidence that they did provide three of the plaintiffs who have appeared in this action with their chosen alternative, a community residence, once appropriate community residences agreed to accept those plaintiffs.  In other words, Defendants argue that Plaintiffs are not being denied their choice of an alternative to institutional care; rather, Plaintiffs are being required to wait until an appropriate alternative becomes available. The Court finds that Plaintiffs have fallen short of establishing a likelihood of success on the merits of their Freedom of Choice claim.

### c.   Fair Hearing

Plaintiffs allege that they have been denied the right to a fair hearing under the Medicaid Act, as well as the Fourteenth Amendment, discussed below.  Under the "Fair Hearing Provision," 42 U.S.C. § 1396a(a)(3), State Medicaid plans must provide "an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness."  Both sides agree that Defendants have determined that Plaintiffs are eligible for services, so none of their claims have been "denied." Plaintiffs maintain that they are entitled to hearing because they have not received the services after long periods of waiting.  However, the statute unambiguously provides for a hearing when a claim is "not acted upon." 42 U.S.C. § 1396a(a)(3).  As set forth above, Defendants provide ample evidence that they have acted on Plaintiffs' claims.

### 2.   Plaintiffs' ADA and Rehabilitation Act Claims

To establish a violation of Title II of the ADA and Section 504 of the Rehabilitation Act, Plaintiffs must prove that (1) they are "qualified individual[s]" with a disability; (2) that the

Defendants are subject to the ADA and the Rehabilitation Act; and (3) that they were denied the opportunity to participate in or benefit from the defendants' services, programs, or activities, or were discriminated against by defendants, by reason of his or her disability. *Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir. 2003). There is no dispute that Plaintiffs meet the first two elements under the ADA and Rehabilitation Act. Regarding the third element, Plaintiffs argue that they have been subjected to: discriminatory segregation in violation the "integration mandate," *see* 28 C.F.R. § 35.130(d); 29 U.S.C. § 794, and discriminatory methods of administration, *see* 28 C.F.R. § 35.130(b)(3); 45 C.F.R. § 84.4(b)(4).

The integration mandate requires that people with disabilities receive services in the "most integrated setting appropriate to their needs." 28 C.F.R. § 35.130(d) (ADA); *see* 28 C.F.R. § 41.51(d) (Rehabilitation Act). The key authority on point is *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999). In *Olmstead*, "the Supreme Court interpreted the integration mandate to mean that the 'unjustified isolation' of disabled individuals in institutionalized care facilities constitutes discrimination on the basis of disability under the ADA." *Davis v. Shah*, 821 F.3d 231, 262 (2d Cir. 2016) (quoting *Olmstead*, 527 U.S. at 597). The State must make "reasonable modifications" to avoid such discrimination, "unless the public entity can demonstrate conclusively that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

Thus, under *Olmstead*, Plaintiffs must show: (1) the State's treatment professionals have determined that community-based placement or services are appropriate for the plaintiffs, (2) the plaintiffs do not oppose such placement or services, and (3) the placement or services can be reasonably accommodated "taking into account the resources available to the State and the needs of others with [similar] disabilities." *Olmstead*, 527 U.S. at 607. Defendants can rebut this *prima*

*facie* case by showing that the requested accommodation would require fundamentally altering the nature of the State program.

With respect to Plaintiffs' *Olmstead* claim, there is no dispute that the State's treatment professionals have determined that community-based placements are appropriate for Plaintiffs, and Plaintiffs want to be placed in community residences. Plaintiffs also offer evidence that residential providers have thousands of vacancies and that OPWDD has significant resources. Thus, Plaintiffs' *Olmstead* claim hinges on whether the State can reasonably accommodate Plaintiffs' near-immediate placement in community residences without fundamentally altering the State's placement program. Defendants offer evidence that Plaintiffs have not been placed in community residences, despite OPWDD making numerous referrals on behalf of each plaintiff, because each provider thus far has concluded that it could not safely serve both that plaintiff and the other residents in the provider's care. Defendants persuasively argue that they presently have no legal authority to compel residential providers to accept Plaintiffs, and such compulsion would require a fundamental change to the program. Def. Opp. at 15–17.

Plaintiffs implicitly concede that they are requesting a fundamental change to the State system. Plaintiffs contend that Defendants have not developed an adequate system for placing individuals in community residences and that Defendants should change the State's system such that OPWDD is a provider of last resort. *See* Pl. Mem. at 3; Tr. at 22:8–9. At the hearing on Plaintiffs' motion for a preliminary injunction, defense counsel, in effect, asked, "if that isn't a fundamental alteration of the system . . ., what is[?]" Tr. 38:17–24. At this stage, Plaintiffs have not adequately answered that question. Given their high burden in this posture, Plaintiffs have not shown a likelihood of success on the merits of their *Olmstead* claim. Similar reasoning applies to Plaintiffs' discriminatory methods of administration claim.

### 3.  Plaintiffs' Constitutional Claims

Plaintiffs assert two Fourteenth Amendment violations.  They argue that: (1) Plaintiffs are entitled to a hearing under the Due Process Clause; and (2) Defendants' failures, thus far, to place Plaintiffs in community residences violate Plaintiffs' substantive due process rights to be free from unreasonable bodily restraints.  Under *Goldberg v. Kelly*, 397 U.S. 254 (1970), individuals have a right to a hearing before denial of a benefit in which they have a cognizable property interest.  *See Mayer v. Wing*, 922 F. Supp. 902, 910 (explaining that Medicaid benefits are cognizable property interest under the Fourteenth Amendment).  However, as discussed above, Plaintiffs have not been denied benefits.  *See P.D., by his guardian H.D., v. Neifeld et al.*, 21-cv-6787 [ECF No. 37 at 12].  On the contrary, a key basis for Plaintiffs' complaint is that Defendants long ago deemed Plaintiffs entitled to the services they seek.  Plaintiffs do not have a constitutional right to a hearing about the delay of a benefit.  *See N.Y. State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 166 (2d Cir. 2001); *Polk v. Kramarsky*, 711 F.2d 505, 509 (2d Cir. 1983).

With respect to Plaintiffs' substantive due process claim, Defendants are not subjecting Plaintiffs to "unnecessary bodily restraint[.]"  Pl. Mem. at 22.  Plaintiffs concede "they are free to leave" the institutions in which they currently live.  Tr. at 13:16–17.  The cases Plaintiffs cite are about the right of the institutionalized to standards of "reasonable care and safety."  *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982) (involuntarily committed); *Soc'y for Good Will to Retarded Child., Inc. v. Cuomo*, 902 F.2d 1085, 1090 (2d Cir. 1990).  Plaintiffs have not presented any evidence that the institutions in which they live violate professionally accepted minimum standards

of care.  Plaintiffs' constitutional claims are likely meritless.  Plaintiffs certainly have not shown a likelihood of success on the merits of these claims.

## IV.   CONCLUSION

For the reasons set forth above, Plaintiffs' motion for a preliminary injunction is DENIED. However, by January 30, 2023, Defendants must file an affidavit detailing what further steps they have taken to place each plaintiff since November 2022.

**SO ORDERED.**

Date:  **December 15, 2022**
       **New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**